Kevin LECKELT

v.

**BOARD OF COMMISSIONERS OF HOSPITAL DISTRICT NO. 1, et al.**

Civ. A. No. 86–4235.

United States District Court, E.D. Louisiana.

March 15, 1989.

Lambda Legal Defense and Educ. Fund, R. James Kellogg, Trial Atty., New Orleans, La., for Kevin M. Leckelt.

William P. Quigley, General Counsel, ACLU of Louisiana, The Advocacy Center for the Elderly and Disabled, Maureen O'Connell, James E. Comstock–Galagan, Ruth Colker, ACLU of Louisiana, Tulane University School of Law, New Orleans, La., Nan D. Hunter, Judith Levin, Staff Attys., American Civil Liberties Union Foundation, New York City, for plaintiff.

Watkins & Walker, William S. Watkins, Ann M. Barker, Trial Attys., Houma, La., Keck, Mahin & Cate, K. Bruce Stickler, Andrew B. David, Mark D. Nelson, Chicago, Ill., Kullman, Inman, Bee & Downing, Elmer E. White, III, Trial Atty., New Orleans, La., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATRICK E. CARR, District Judge.

Plaintiff, Kevin Leckelt, brought this action against defendants, Board of Commissioners of Hospital District No. 1, who operate and govern the Terrebonne General Medical Center (TGMC) in Houma, Louisiana; the individual commissioners, namely, Pearl Bonvillain, Elward Brady, Phillip Cooper, Jimmy Dagate, Dr. Richard Landry, Dr. Glenn Manceaux, J.B. Marceaux, Chester Morrison, Dr. Mae Ellen Terrebonne, Rev. Craig Rinker and Donald Verrett; Alex Smith, Executive Director of TGMC; Mable Russell Michel, Director of Nursing for TGMC; Gustavia Growe, Infection Control Nurse; and William Miller, Director of Human Resources for TGMC. The plaintiff claims that defendants have violated his rights secured by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794,

the Louisiana Civil Rights for Handicapped Persons Act, R.S. 46:2251, et seq., the Fourth and Fourteenth Amendments to the United States Constitution and the Constitution of Louisiana. Plaintiff alleges that defendants illegally and unconstitutionally singled him out by requiring that he divulge medical information about his human immunodeficiency virus (HIV) status, suspended him pending disclosure of the information, and discharged him when he refused to provide the information.

Trial without a jury commenced on July 25, 1988. Additional evidence was taken on December 1, 1988 pursuant to the Court's order granting defendants' motion to reopen. After considering the pleadings, the testimony of the witnesses, the documents in evidence, and the law applicable to this case, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

The Court has jurisdiction in this matter pursuant to Title 28 U.S.C. § 1331 and 1343(a)(3).

Under nationally followed guidelines hospitals may have to modify the duties of employees with certain infectious diseases, including HIV. In order to implement these guidelines most effectively, a hospital may need to require medical testing for an employee whom it learns has a high medical risk of having such diseases. Plaintiff was a licensed practical nurse whose duties came within these guidelines; when it became apparent that plaintiff had such a medical risk, the hospital asked him to provide it with HIV test results in order to determine what reasonable accommodation, if any, may be required. Plaintiff refused and, thus was terminated for insubordination. Because a hospital has a right to require such testing in order to fulfill its obligation to its employees and to the public concerning infection control and health and safety in general, plaintiff's employer was justified in terminating him.

## INFECTION CONTROL

An important function within any health care facility is infection control, which is concerned with preventing the spread of disease, either from employees to patients or from patients to employees. Directed to this end, health care facilities, such as TGMC, have established infection control departments which administer infection control policies by promulgating a set of procedures for health care workers to follow, making those procedures known, and enforcing them. The Center for Disease Control (CDC) has established guidelines which have become the standard for institutions in maintaining infection control in health care facilities. One such guideline has been to establish a system by which hospitals report infections among its patients and employees. This recommendation has also been adopted by the American Hospital Association (AHA).

At TGMC, Gustavia Growe was the infection control practitioner who was responsible for overseeing the enforcement of infection control procedures in the hospital. TGMC did not have a specific written policy concerning HIV infection or AIDS, but had infection control procedures regarding communicable and infectious diseases which would encompass HIV or AIDS. The purpose of these policies was to "insure that employees received proper and necessary medical treatment to prevent serious prolonged illnesses, to protect both patients and employees from the possibility of contracting infectious diseases from employees who have a communicable disease, and to provide a safe environment and safeguard the health of all patients and employees." To this end, TGMC's infection control policies required employees to report any infectious or communicable disease to employee health service. Culture and sensitivity testing of employees was to be conducted where indicated (for example exposure to TB, hepatitis or syphilis). Employee test results were evaluated by the employee health nurse and consultation conducted with the individual employee's physician. Any employee found to have a communicable disease was required to receive clearance from his physician prior to returning to active employment. While an employee was absent from work due to an

infectious disease, he was paid sick time benefits. Working restrictions were placed on employees as the disease indicated, including reassignment to areas not associated with direct patient care. Infectious employees allowed to work in direct patient care were required to scrupulously follow infection control procedures to decrease potential risk to others. Periodic re-evaluation of the health of active duty personnel was to be conducted as it related to their work, as well as evaluation as required by their symptoms or exposure to an infectious hazard. (Defendants Ex. D–3.1 through D–4.3 and D–9).

TGMC's employee handbook stated that employees committing serious infractions of TGMC policy were subject to immediate termination, insubordination being listed as a serious offense. Plaintiff was given an employee handbook when he began employment at TGMC and signed a statement that he had read and understood TGMC's policies contained in the employee handbook.

## ACQUIRED IMMUNODEFICIENCY SYNDROME

Extensive expert medical testimony was presented in this case concerning the human immunodeficiency virus (HIV) and acquired immunodeficiency syndrome (AIDS). The human immunodeficiency virus or HIV is a retrovirus that attacks white blood cells (T-lymphocytes) in the human blood. This virus attacks the immune system and damages the ability of the infected person to fight off other diseases. The individual then becomes significantly more susceptible to opportunistic infections.[1] AIDS is the presence of HIV coupled with the diagnosis of one or more opportunistic infections which, although usually harmless to a healthy person, thrive on the suppressed immune system of a person with AIDS. A diagnosis of dementia or wasting, together with the presence of HIV, also constitutes AIDS. There are many less severe symptoms of HIV infection that do not amount to AIDS, but that nonetheless indicate that HIV has in some way compromised the person's immune system.

Once a person has become infected with HIV, he may not show any signs of illness. Such a person does not have AIDS but is a carrier of HIV. It is impossible to determine when an HIV positive individual will become symptomatic. Symptoms of HIV infection include fever, swollen lymph nodes, loss of weight, decreased appetite, diarrhea, and night sweats. It is presently estimated that between 50% and 70% of all HIV positive carriers will eventually show symptoms of the AIDS disease. Some portions of the medical community believe, however, that recent studies show that the number of HIV carriers who become symptomatic will eventually reach 100%. Another possible effect of an HIV infection is neurological alterations such as memory loss, behavioral changes, progressing to inability to care for oneself and dementia. Some few individuals who exhibit neurological effects of AIDS do not have other observable physical effects of the disease. Neurological effects of AIDS consist of slow, gradual changes in the individual's brain functions.

There is no known cure for AIDS, nor has a vaccine been developed to prevent it. Extensive research continues to be conducted on the epidemiology of HIV since its discovery in 1980. A new drug, AZT, although not a cure, has helped decrease the number of opportunistic diseases contracted by a patient with HIV, thus, prolonging the lives of these individuals. However, at the present time, a person diagnosed with AIDS is terminal.

The medical consensus is that HIV is primarily transmitted in one of three ways: intimate sexual contact, exposure to blood or blood components, and from mother to fetus in utero or through breast milk. HIV cannot be transmitted by casual contact.

The Center for Disease Control (CDC) has reported three cases in which health care workers have become infected with

---

1. These opportunistic diseases include atypical tuberculosis, pneumocystis carinii pneumonia, Karposi's sarcoma, and herpes zoster.

HIV through unexplained or unexpected means. Research continues at this time to determine additional modes of transmission of HIV.

In April, 1986, there were two separate tests designed to test exposure to HIV. Those tests which detect antibodies for HIV, are (1) the enzyme-linked immunosorbent assay (ELISA), and (2) the western blot assay. There is no test commercially available that is an antigen test (i.e., which detects the actual existence of HIV itself, as opposed to the antibodies.) A person who tests positive on both tests is considered seropositive for HIV.

If an individual tests positive for HIV antibody, this indicates that the virus has been in the body and is most likely there. A positive test result does not mean that an individual has symptoms of AIDS. However, everyone with AIDS is HIV positive.

In November, 1985, the CDC issued guidelines for preventing the spread of HIV (then referred to as "HTLV–III/LAV") in the work place. As public safety sensitive institutions, health care facilities were the primary focus of the CDC guidelines. These guidelines stated that:

> TRANSMISSION FROM HEALTH-CARE WORKERS (HCW) TO PATIENTS Risk of Transmission of HTLV–III/LAV Infections from HCWs to Patients. Although there is no evidence that HCWs infected with HTLV–III/LAV have transmitted infection to patients, a risk of transmission of HTLV–III/LAV infection from HCWs to patients would exist in situations where there is both (1) a high degree of trauma to the patient that would provide a portal of entry for the virus (e.g., during invasive procedures), and (2) access to blood or serous fluid from the infected HCW to the open tissue of a patient, as would occur if the HCW sustains a needle stick or scapel injury during an invasive procedure. HCWs known to be infected with HTLV–III/LAV who do not perform invasive procedures need not be restricted from work unless they have evidence of other infection or illness for which any HCW would be restricted. Whether additional restrictions are indicated for HCWs who perform invasive procedures is currently being considered.
>
> Precautions to prevent transmission of HTLV–III/LAV infection from HCWs to patients. These precautions apply to all HCWs, regardless of whether they perform invasive procedures: (1) all HCWs should wear gloves for direct contact with mucus membranes or non-intact skin of all patients, and (2) HCWs who have exudative lesions or weeping dermatitis should refrain from all direct patient care and from handling patient-care equipment until the condition resolves. Management of parenteral and mucus membrane exposures of patients. If a patient has a parenteral or mucus membrane exposure to blood or other body fluids of a HCW, the patient should be informed of the incident and the same procedure outlined above for exposures of HCWs to patients should be followed ...
>
> Serologic testing of HCWs. Routine Serologic testing of HCWs who do not perform invasive procedures ... is not recommended to prevent transmission of HTLV–III/LAV infection. The risk of transmission is extremely low and can be further minimized when routinely recommended infection/control precautions are followed ... whether indications exist for serologic testing of HCWs who perform invasive procedures is currently being considered.
>
> Risk of occupational acquisition of other infectious diseases by HCWs infected with HTLV–III/LAV. HCWs who are known to be infected with HTLV–III/LAV and who have defective immune systems are at an increased risk of acquiring or experiencing serious complications of other infectious diseases. Of particular concern is the risk of severe infection following exposure to patients with infectious diseases that are easily transmitted if appropriate precautions are not taken. HCWs infected with HTLV–III/LAV should be counseled about the potential risk associated with taking care of patients with transmis-

sible infections and should continue to follow existing recommendations for infection control to minimize their risk of exposure to other infectious agents. The HCWs' personal physician, in conjunction with their institution's personnel health services or medical directors, should determine on an individual basis whether the infected HCWs can adequately and safely perform patient-care duties and suggest changes in work assignments, if indicated ...

At trial, all medical experts admitted that it would be impossible to follow the above stated CDC guideline unless the health care facility knew the health care worker's HIV status. In his expert report, Exh. D–19, Dr. Peter Mansell, defendant's medical expert, stated that: "The CDC guidelines, in my opinion, both provide for and suggest that hospitals may seek to have an employee tested who it reasonably suspects has been exposed to the virus." The CDC guidelines call for continuing consultation between the health care facility and the employee's physician to determine, on an individualized basis, what job assignments the employee is capable of fulfilling. The CDC guidelines address the possibility that a seropositive employee may have to be restricted from caring for patients with highly contagious diseases due to the impairment of their immune system. Only with knowledge of the employee's seropositivity can the health care facility closely monitor that employee for determination of his work assignments.

The American Hospital Association issued a report explicitly adopting the CDC guidelines. This report recognized that health care facilities must make decisions "with regard to direct patient care responsibilities for employees with AIDS or [HIV] infection." (Exhibit P–1). The American Hospital Association recommended that:

If an individual has a[n] ... exposure to blood or other body fluids, the source patient should be assessed ... If the source patient has AIDS or other evidence of [HIV] infection, declines testing, or has a positive test result, the exposed individual should be tested clinically and serologically for evidence of [HIV] infection ...

According to Dr. Mansell the same protocol should be followed in situations where the exposure is outside of the hospital rather than from a source patient.

## PLAINTIFF'S EMPLOYMENT AT TGMC

The defendant, Hospital Service District No. 1, Terrebonne Parish, Louisiana, is a governmental entity created under the Louisiana Hospital District Law of 1950, as amended. It is governed by the defendant Board of Commissioners and operates Terrebonne General Medical Center in Houma, Louisiana. The individual commissioners are appointed by the Terrebonne Parish Police Jury pursuant to La.R.S. 46:1052 and are charged with the governance of TGMC.

The plaintiff was employed as a licensed practical nurse by TGMC from June, 1978, until he was discharged on May 1, 1986. During that time, plaintiff's daily activities included making rounds, assessments, giving medication, both orally and by injection, starting I.V.'s, changing dressings, performing catherizations, and giving enemas. While plaintiff was employed at TGMC, he was assigned to a surgical/medical floor that cared for all types of medical patients as well as pre and post-operative patients. At times, plaintiff was assigned to work in other areas of the hospital, including the intensive care unit (ICU), emergency room (ER), and surgical recovery room (SRR).

Starting IVs (intravenous lines) has not been considered by the medical community as being an invasive procedure. However, this is under debate at this time. IVs do provide routes to a patient's blood and body fluids as does injecting medication, performing catherizations, changing dressings and administering enemas. Plaintiff's occasional work assignments to ICU, ER and SRR would also bring him into contact with patients experiencing a high degree of trauma. The Court finds that plaintiff's duties come within the situations outlined by the CDC guidelines.

In March, 1986, plaintiff's friend and roommate of eight years, Marvin Potter, was admitted as a patient at TGMC and was later diagnosed as having acquired immune deficiency syndrome (AIDS). Many of the employees at TGMC knew that plaintiff and Potter lived together and understood that they were homosexuals.[2] Potter remained at TGMC until April 9, 1986, when he was transferred to New Orleans where he died on April 21, 1986, of a secondary infection incident to AIDS.

In the spring of 1986, at the same time Potter was diagnosed as having AIDS, the plaintiff decided to have an HIV test performed. Plaintiff had the test performed anonymously in New Orleans to determine whether he was seropositive for the antibodies for the virus believed to cause AIDS. Plaintiff has never received his HIV test results.

## PLAINTIFF'S CARE OF GLADYS VERBUS

Gladys Verbus was a patient at TGMC from January 17, 1984 to January 27, 1984 and testified at trial in December, 1988, concerning plaintiff's nursing care to her while she was hospitalized. Verbus had undergone knee surgery on January 18, 1984. Verbus testified that the plaintiff had a cut on his finger that was covered by a blood-soaked bandaid and that without wearing gloves, plaintiff removed bandages from Verbus' surgical incision and manipulated her wound while a watery, bloody substance was dripping from plaintiff's cut through the bandaid and a paper towel wrapped around his finger. Plaintiff also manipulated Verbus' intravenous line which had moved out of place.

Although the Court finds the full extent of Verbus' testimony to be unlikely, the Court finds, however, that plaintiff did not utilize barrier precautions (gloves) during his care of Gladys Verbus' intervenous line and surgical wound. This testimony construed in light of the testimony of Dr. Theodore Eickhoff, plaintiff's expert, that health care workers at times do not use

barrier precautions when indicated, demonstrates to the Court that there are opportunities for blood to blood or blood to body fluid contact between a health care worker and patient and that some health care workers, even those in high risk groups, negligently fail to utilize proper infection control procedures at all times.

## PLAINTIFF'S TERMINATION

On April 4, 1986, defendant, Alex Smith, the executive director of TGMC, received a visit from Dr. James Nelson, TGMC's acting chief of staff. Mr. Smith was informed by Dr. Nelson that a patient in the hospital (Marvin Potter) who was HIV seropositive and was believed to have AIDS, was the roommate of a licensed practical nurse (LPN) at TGMC. Dr. Nelson explained that the medical staff was concerned about the situation, and passed on the medical staff's belief that the employee's health status should be determined.

Smith was aware of the growing concern about AIDS. Smith had reviewed a number of articles and materials concerning AIDS, including excerpts from the CDC guidelines and the AHA report. Smith understood that the guidelines' recommendation was that a health care worker, if seropositive, should be counseled and the health care facility is to confer with the employee's personal physician.

After consulting legal counsel and reviewing materials concerning AIDS, Smith determined that in order for TGMC to comply with the CDC guidelines and the AHA recommendations, it needed to know plaintiff's HIV status, i.e., whether he was seropositive or seronegative.

Smith informed the executive committee of the TGMC board of the situation at its next regular monthly meeting of April 7, 1986. It was informally agreed that Smith would ask the employee to submit to an HIV test. The board members discussed options regarding the employee's employment if it turned out that he was seropositive. At no time was the plaintiff's name

2. All of the experts agreed that homosexual males are in a high risk group for contracting HIV and AIDS. Plaintiff does not dispute that he is in a high risk group.

mentioned and at no time was it agreed that plaintiff would be terminated if he was found to be seropositive.

Subsequently, Smith met with Mable Michel, TGMC's director of nursing, and informed her of the situation. Smith in turn discussed it with defendant, Gustavia Growe, TGMC's infection control practitioner. Gustavia Growe, as infection control practitioner, met with plaintiff on April 8, 1986 and discussed plaintiff's roommate, Marvin Potter, Potter's condition, and the concern that the hospital had about plaintiff's health. Growe asked plaintiff to undergo HIV testing. Plaintiff informed Growe that he had already undergone testing in New Orleans because of his concern with his health status. Plaintiff was then asked to submit the test results to Growe. Plaintiff agreed that he would present the results to Growe on April 11, 1986.

On April 11, 1986, plaintiff failed to submit the test results to Growe. When Growe contacted plaintiff, he informed her that he had not yet picked up the test results and did not know if he was legally required to divulge them to TGMC and was concerned about his job if his test results were positive. Growe informed the plaintiff that no decision had been made as to what impact a positive test result would have on his employment. After this information was relayed back through the chain of command to Smith, Smith determined that plaintiff would be required to divulge his test results in order for TGMC to comply with CDC guidelines. Smith also determined that if plaintiff reported a positive test result he was to be placed on leave with pay and that if plaintiff failed to submit his test results he would be disciplined, including termination for failure to follow policy. This was relayed to plaintiff and he was informed that he would have to submit his test results to Growe prior to returning to work. At the time of these conversations, plaintiff was undergoing physician's treatment for a draining cyst. According to policy, such a condition required a doctor's clearance to return to work, and plaintiff was so informed.

After Friday, April 11, plaintiff made no attempt to contact Growe or anyone else at TGMC about his test. Plaintiff was next scheduled to work on April 16th and when he had not submitted his test results by then, Growe contacted him to determine if he would be bringing her the results that day. Plaintiff answered Growe's telephone call, informed her that he was speaking with his attorney on the other line, and hung up. Plaintiff never spoke to Growe again.

During this time, Growe had learned for the first time that plaintiff was a hepatitis B carrier. For several years plaintiff had been a carrier and had not informed TGMC of this fact in accordance with their infection control practices. At this same time, Growe also learned that plaintiff had suffered a syphilis infection in March, 1985 and had not informed TGMC of this problem. Plaintiff's other prior medical history, known by TGMC, included a lymphadenopathy in February, 1984 which was possibly related to AIDS, and a syphilis infection in December, 1984.

Because plaintiff had not submitted his test results, plaintiff did not report to work on either April 16th or 17th. He was not scheduled to work again until April 21st. On April 21st he called TGMC and informed them that he would not be in to work that day or the next and reported that Potter had died.

On Monday, April 24th, when Smith learned that plaintiff had not brought in his test results, that he had missed three days of work, that plaintiff's roommate had died of AIDS, and was informed of plaintiff's other previously unknown health problems, Smith became more concerned about plaintiff's health status. Because plaintiff had not brought in his test results and showed no sign of doing so and had not informed TGMC of his other health problems, Smith contacted defendant, William Miller, Director of Human Resources for TGMC, and instructed him to terminate the plaintiff. Smith informed Miller that plaintiff was being terminated for violating TGMC policies, including insubordination, by failing to

bring in his test results, as well as by failing to contact Growe concerning them.

Miller met with plaintiff, plaintiff's aunt, and Michel, Director of Nursing, on Tuesday, April 29th, and informed plaintiff that he was being terminated for failing to follow hospital policy.

In 1987, plaintiff began employment with Jo–Ellen Smith Hospital in New Orleans and is currently employed by that facility. From the time of his discharge until his employment at Jo–Ellen Smith, plaintiff collected unemployment compensation and earned money from part time jobs.

*Rehabilitation Act*

The plaintiff claims that the defendants discharged him in violation of the 1973 Rehabilitation Act on the basis of a perceived handicap. Plaintiff alleges that TGMC perceived he was seropositive for HIV and, thus, handicapped within the meaning of the Rehabilitation Act. Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, provides that:

> No otherwise qualified individual with handicaps ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

Defendants have admitted that they receive federal assistance and thus, are subject to § 504 of the Rehabilitation Act. Therefore, the issues before the Court are: 1) whether the plaintiff was an individual with handicaps 2) whether plaintiff was discharged solely because of this handicap; and 3) whether plaintiff was otherwise qualified to retain his position.

**3.** The 1974 Senate Report explains the definition as follows:

> Clause (C) in the new definition clarifies the intention to include those persons who are discriminated against on the basis of handicap, whether or not they are in fact handicapped, just as Title VI of the Civil Rights Act of 1964 prohibits discrimination on the ground of race whether or not the person discriminated against is in fact of a racial minority. This subsection includes with protection of Sections 503 or 504 those persons who do not in fact have the condition which

The plaintiff must establish a prima facie case by showing that he is a handicapped person within the meaning of the Act that he is qualified for employment at TGMC apart from his handicap and that he was discharged from employment under circumstances which support a finding that his discharge was based solely on this handicap. Once a plaintiff establishes a prima facie case, the defendants must come forward with evidence of a legitimate, nondiscriminatory reason for discharging the plaintiff or must show that the plaintiff, though handicapped was not otherwise qualified. If the defendants meet their burden, the plaintiff then has an opportunity to prove either that the reason given by defendants is a pretext or that the reason given by defendants "encompasses unjustified consideration of the handicap itself." *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372, 1387 (10th Cir. 1981).

The first element that plaintiff must prove is that he was an individual with handicaps within the meaning of § 504 of the Rehabilitation Act. Congress has defined an individual with handicaps to include individuals who are perceived as having an impairment as well as individuals who actually have an impairment:

> Any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having an impairment.

29 U.S.C. § 706(7)(B) [3]

The plaintiff claims that the defendants perceived him as being seropositive for HIV and thus, handicapped.[4]

> they are perceived as having, as well as those persons whose mental or physical condition does not substantially limit their life activities and thus are not technically within Clause (A) in the new definition. Members of both these groups may be subjected to discrimination on the basis of being regarded as handicapped. Senate Report No. 93–1297, 93rd Cong., 2d Sess. 39, *reprinted in* 1974 U.S.Code Cong. & Admin. News 6373, 6388–89.

**4.** Certain district courts and the Department of Justice have recognized that HIV seropositivity is itself an impairment protected by Section 504.

The Court finds that the defendants did not at any time perceive plaintiff to be seropositive for HIV and thus, handicapped. The fact that defendants repeatedly insisted that plaintiff produce his test results flies in the face of a conclusion that defendants perceived plaintiff as being HIV positive. No evidence was produced by plaintiff that anyone involved in the decision to discharge plaintiff ever concluded that he was seropositive. All witnesses testified that no determination had been made with regards to the results of plaintiff's test. Plaintiff's employment options were discussed at the board of directors meeting which included new assignments, transfer to another department or unit, extra precautions, leaving plaintiff in his same position, and possible termination. However, testimony was uncontradicted that no decision had been made regarding the plaintiff's employment with regard to his results of the HIV test. In fact, Alex Smith's memorandum of April 11, 1986 stated TGMC's intention that if tested positive, "he should be placed on immediate leave with pay pending further review," thus, further evidencing that defendants did not intend to immediately terminate the plaintiff. If the defendants had formed such a perception of plaintiff's seropositivity for HIV, there would have been no reason for them to suggest plaintiff be tested and to continue requesting his test results for three weeks before terminating him.

■ Neither did plaintiff produce evidence from which it could be inferred that TGMC discharged plaintiff *solely* because of a perceived handicap. Section 504 of the Rehabilitation Act prohibits discrimination against qualified individuals with handicaps only when that discrimination is "solely by reason of" such handicaps. 29 U.S.C. § 794. When an employer has a lawful motive for discharging an employee, the employer's coincidental consideration of the employee's handicap does not prevent the employer from acting on its lawful motive.

*Norcross v. Snead,* 755 F.2d 113, 117 n. 5 (8th Cir.1985).

In *Doe v. Centinela Hospital,* No. CV 87–2514, 1988 WL 81776 (C.D.Cal. June 30, 1988), the plaintiff was discharged from defendants' residential alcohol and drug rehabilitation program after he tested positive for the presence of HIV. Centinela Hospital required all patients who enrolled in their program to take an HIV antibody test and all patients whose test results were positive were excluded from the program. There, the defendants did not require an HIV test for other programs including the outpatient drug and alcohol abuse program. It was uncontested that the defendant hospital did not make any individualized assessment of the plaintiff's qualifications for admission other than to administer the HIV test and exclude him on that basis alone. There was no evidence in the record that indicated plaintiff was not qualified for participation in the program other than his infection with the virus. The court found that the defendants had discriminated against plaintiff solely on the basis of his perceived handicap. This is not the situation in the present case. Here, TGMC did not have a blanket policy requiring testing of all employees, but only those who had an exposure to HIV. Neither did the TGMC terminate all employees that tested HIV positive. TGMC did not terminate plaintiff solely because he was allegedly perceived to be seropositive.

■ Defendants, Alex Smith and Mable Michel, testified that plaintiff was terminated for failure to follow hospital policy and not because he was perceived to be seropositive for HIV. TGMC's infection control policies required employees to report any infectious or communicable diseases to the employee health service. During the communications between defendants and plaintiff concerning his test results, Gustavia Growe learned that plaintiff had failed to report that he was a hepatitis

*See,* Department of Justice, Office of Legal Counsel, "Application of Section 504 of the Rehabilitation Act to HIV-infected Individuals," September 27, 1988; *Ray v. School District,* 666 F.Supp. 1524 (M.D.Fla.1987); *Thomas v. Atas-cadero Unified School District,* 662 F.Supp. 376, 379 (C.D.Cal.1987); *Local 1812, Am. Fed. of Government Employees v. United States Department of State,* 662 F.Supp. 50, 54 (D.D.C.1987).

B carrier and that he had had a syphilis infection in March, 1985. These facts, in conjunction with plaintiff's failure to submit test results in compliance with hospital policy, established a legitimate motive for discharging an employee at TGMC. At the termination hearing, William Miller, Director of Human Resources, informed plaintiff that he was being discharged for failure to follow hospital policy. Plaintiff was well aware of the hospital's infection control policies and the consequences of failure to follow hospital policies as outlined in the employee handbook.

TGMC's infection control policies setting forth the hospital procedure for handling employees with an infectious or communicable disease (outlined *supra*) also indicates that TGMC did not discharge plaintiff solely because of having an alleged perceived handicap. TGMC, as most major hospitals, was well versed in the handling of employees with communicable or infectious disease and in preventing their spread to patients or other employees. Actions by the hospital would be taken with regard to the individual's specific disease including leave of absence for three weeks in the case of a hepatitis infection, change in work assignments and removal from direct patient care. (See Exhibit D–3.2). No evidence was presented that plaintiff, if found to be seropositive, would have been treated any differently than other employees suffering with other infections. The defendants did not act out of fear and ignorance, plaintiff was discharged because he had violated the hospital infection control policies on reporting infectious or communicable diseases, and not because he was regarded as being seropositive for HIV. Accordingly, there is no basis in the record for concluding that plaintiff's discharge was solely because of a perception that he was handicapped.[5]

■ Further plaintiff's claim under the Rehabilitation Act also fails because he was not "otherwise qualified" to continue in TGMC's employ. An "otherwise qualified" person, in the employment context, is one who can perform the essential functions of the job in question in spite of his handicap. *Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Essential to the function and purpose of such a public safety sensitive institution as a hospital is the adherence by the hospital employees to infection control policies. Hospitals are not at liberty to presume, at the risk of the lives of the public, that all employees adhere to their infection control policies at all times. Hospitals must establish policies and procedures for controlling the risk of transmitting infectious or communicable diseases. As indicated by the plaintiff's care of the patient, Gladys Verbus, the testimony of plaintiff's expert Dr. Eickhoff, and the CDC's specific mention regarding patient exposure to the blood or body fluids of an infected health care worker, opportunities exist for the transmission of HIV from health care workers to patients such that hospitals must monitor employees' health status (especially those in high risk groups) and their use of barrier precautions. Plaintiff's refusal to comply with TGMC's infection control policies rendered him "not otherwise qualified" to perform his job as a licensed practical nurse.

The CDC guidelines call for continuing consultation between the health care institution and the employee's personal physi-

---

5. In plaintiff's reply brief, he raises the contention that the defendants are precluded from arguing that plaintiff was terminated for insubordination, i.e., failure to follow hospital policy. The plaintiff asserts that the decision of the State of Louisiana Appeals Tribunal for the Office of Employment Security determined that plaintiff was not terminated from his employment for misconduct under the Louisiana Employment Compensation Statutes. However, no evidence was introduced at trial concerning the substance of the plaintiff's unemployment compensation hearings. An administrative and un-

employment compensation decision has no preclusive effect in a subsequent proceeding involving rights allegedly created by federal law. *Causey v. K & B, Inc.*, 670 F.Supp. 681, 689 (E.D.La.1987). Neither does collateral estoppel apply in the present case since the informality and purpose of unemployment compensation proceedings do not afford the parties with the full and fair opportunity to litigate. *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1283 (9th Cir.1986). Thus, this Court is not precluded from deciding this issue.

cian to determine, on an individualized basis, what job assignments the employee is capable of filling. Although an asymptomatic seropositive individual may present a relatively slight risk to patients, co-workers and himself, and may require relatively little accommodation, a health care institution must know the individual's health status so that it can monitor his condition and determine whether that condition has deteriorated to a point where additional precautions or job modifications are necessary.

In *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Court stated:

> Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness. Even those who suffer or have recovered from such non-infectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious. The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments. 107 S.Ct. at 1129.

In assessing whether an individual is qualified to perform his job, the *Arline* court recognized and rejected prejudice and ignorance as a basis for employers' actions, requiring instead that courts "defer to the reasonable medical judgments of public health officials." *Id.* at 1131. Under the law enunciated in *Arline,* employers are to conduct an individualized inquiry into the health status of an individual employee handicapped with a contagious disease and not act on fear and ignorance. *Id.* The defendants' request for plaintiff's test results was nothing more than the first step in this inquiry. TGMC could not make a reasoned and medically sound judgment regarding plaintiff's employment unless it knew plaintiff's health status. Nor, could defendants establish reasonable accommodation for plaintiff such as changing job assignments, etc., without such knowledge.

The Restoration Act amended the Rehabilitation Act to codify the result in *Arline.*

In commenting on the amendment, Congressman Edward stated that:

> It require a medical assessment of whether exclusion is necessitated by the degree of risk involved in the particular situation ... The outcome of each case will depend on the *medical facts* concerning the particular infectious condition, how that infection is transmitted, and the nature of the job in question. 134 Cong. Rec. H584 (March 2, 1988) (emphasis added).

Knowledge of plaintiff's HIV status was the beginning of the process of evaluating the medical facts concerning plaintiff's particular situation and the nature of the risk that the defendants and patients may be confronted with.

Defendants also had an affirmative duty to protect plaintiff from the risk of disease and provide him with a safe work place. As outlined *supra,* an individual with HIV infection may have a compromised immune system that renders him vulnerable to increased risk of contracting other diseases. Knowledge of plaintiff's HIV status would have enabled the defendants to modify plaintiff's duties to prevent him from coming into contact with patients suffering from highly contagious diseases. The CDC guidelines envision the possibility that a seropositive employee, regardless of his present condition, may be restricted from caring for patients with such diseases. *Supra,* page 9, para. 5.

Courts have consistently recognized that an employer sometimes must discriminate in denying certain job duties to members of a protected class when the members of that class would be at increased risk of illness or injury in the performance of those duties. *See, e.g., Wright v. Olin Corporation,* 697 F.2d 1172 (4th Cir.1982). TGMC could not fulfill its responsibility to protect plaintiff without having knowledge of plaintiff's health status. Additionally, a health care institution may choose to take additional precautions against transmission if the employee is found to be seropositive. The hospital may want to more closely monitor that employee's compliance with infection control procedures and may

choose to eliminate the risk of transmission through patient/worker contact by modifying the employee's duties. Because plaintiff would not allow defendants to conduct the inquiry necessary to protect patients, co-workers and plaintiff himself from any possible risk he may pose because of his particular situation, defendants had a reasonable belief that plaintiff was not "otherwise qualified" for employment at TGMC.

The defendants had a legitimate and non-discriminatory reason for discharging the plaintiff. The CDC guidelines and the AHA recommendations demonstrate the need of a health care institution to monitor the health status of employees who have been exposed to infectious diseases, particularly diseases such as AIDS which are fatal to 100% of their victims, in order to protect patients and co-workers and to accommodate any current or future handicap of the employee.

Plaintiff produced no evidence at trial to indicate that defendants' request for the test results was a pretext to enable defendants to discharge plaintiff because of his perceived handicap. While the Rehabilitation Act prohibits discrimination, it does not prohibit testing. Regulations adopted pursuant to the Act seek to implement the Act's prohibition of discrimination in the hiring process by seeking to eliminate a device used to mask such discrimination, i.e., testing. The regulations prohibit only *pre-employment* medical examination and pre-employment inquiries of applicants regarding handicaps. 45 C.F.R. § 84.14.[6]

The regulations do not prohibit *post-employment* examinations or inquiries. Where, as here, the language of the regulation is clear, a court may not ignore the plain language and expand the scope of the regulation. *Speakman Co. v. Weinberger*, 837 F.2d 1171, 1173 (D.C.Cir.1988).

The intent of the regulation's drafters was to eliminate artificial barriers to hiring of handicapped individuals. *See* 42 F.Reg.

85, p. 22689. Once an employee has been hired based on his or her qualifications for the job, the need to prohibit medical examinations no longer exists. In fact, post employment medical examinations would be contrary to rather than consistent with the purpose of the Rehabilitation Act under *Arline*. Prohibition of testing would produce the irrational, speculative decision-making which is prohibited under the Act. The *Arline* court clearly endorsed an employer's right to inquire into the health status of its employees and to make reasonable accommodations for that employee's handicap.

In the present case, the defendants' request for plaintiff to submit his HIV test results was job-related and consistent with the purposes of the Rehabilitation Act.

## LOUISIANA CIVIL RIGHTS FOR HANDICAPPED PERSONS ACT

■ Plaintiff has also claimed that the defendants have violated his rights under the Louisiana Civil Rights for Handicapped Persons Act, La.R.S. 46:2251, et seq. La.R.S. 46:2254(C)(5) provides that an employer shall not:

> Discharge or take other discriminatory action against an otherwise qualified individual on the basis of physical or mental examinations or pre-employment interviews that are not directly related to the requirements of the specific job or are not required of all employees.

Plaintiff's claim here fails for the same reasons as it failed under the Federal Act.

Defendants' actions were not based on results of plaintiff's tests, but rather on his failure to divulge the results. Defendant's request for plaintiff's HIV test results was directly related to the requirements of his job. Accordingly, the defendants have not violated the Louisiana Civil Rights for Handicapped Persons Act.

---

**6.** 45 C.F.R. § 84.14(A) states that:
A recipient may not conduct a pre-employment medical examination or may not make pre-employment inquiry of an applicant as to whether the applicant is a handicapped person or as to the nature or severity of a handicap. A recipient may, however, make pre-employment inquiry into an applicant's ability to perform job-related functions.

## EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

■ The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV.[7] The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Where state action has treated a certain class of individuals differently than it treats others, the general rule is that the classification must be rationally related to a state interest. *Id.* However, where the classification is a "suspect class", the courts require heightened scrutiny in examining state action. In *Cleburne,* the Supreme Court held unequivocally that handicapped persons are not a suspect classification.[8] Therefore, the level of review to be employed in this case is the rational basis test.

■ The defendants did not single out a class of handicapped individuals. The evidence at trial demonstrated that defendants conditioned continued employment on medical screening for all persons who were exposed to infectious diseases. TGMC's infection control policies required that all employees exposed to infectious diseases undergo testing if appropriate. Depending on the test results, leave of absences may be indicated and possibly changing work assignments. The class of persons treated differently from other employees by TGMC consisted of all employees exposed to infectious diseases, not all employees perceived to be seropositive.

At approximately the same time that TGMC was requesting the plaintiff to submit his test results, a registered nurse (RN) was reported to have suffered a needle stick from a patient diagnosed with having AIDS (Marvin Potter). Because of such exposure, the defendants had the nurse undergo testing and submit her test results to TGMC, which she did. Likewise, employees who suffered needle sticks from patients with hepatitis B were also tested. Plaintiff claims that the fact that he was placed on leave of absence pending submission of his test results, demonstrates that he was treated differently from other employees who received testing. However, the medical information in defendants' possession at the time plaintiff was placed on leave of absence indicated that plaintiff was not asymptomatic. He was a hepatitis B carrier, had suffered a case of syphilis within the past six months and was undergoing treatment for a draining cyst under his arm. Likewise, when other employees present with symptomatic conditions of an infectious or communicable disease, they, too, are placed on leave of absence with pay pending their test results under TGMC's infection control policies. (Exhibits D–3.1 through D–4.3) Accordingly, the basis for treating plaintiff differently (i.e., for requiring production of test results) was the same as the basis for treating the nurses who suffered needle sticks differently—each had been exposed to a potentially fatal virus and the hospital had a need to know their health status to determine whether and how to modify their duties. The Court finds that TGMC's infection control policies are rationally related to a legitimate state interest of protecting patients and health care workers from the spread of infectious or communicable diseases. Consequently, the defendants have

---

**7.** Since the Hospital District No. 1 is created by state statute and action of the local Police Jury, it meets the state action requirement of the Fourteenth Amendment.

**8.** In *City of Cleburne,* the court overturned a zoning requirement, finding that it was based on irrational prejudice against the mentally retarded. Although Justice White's opinion for the *Cleburne* court rejected the suggestion that unequal treatment of the handicapped, specifically the mentally retarded, should be subjected to strict or intermediate scrutiny, commentators have noted that the Court apparently applied heightened review in the guise of minimum rationality. L. Tribe, Amer. Const. Law., 1595 n. 20 (S.Ed.1988). However, this Court is bound by the clear expression of the Supreme Court in *Cleburne* and thus, applies the rational basis test.

not violated plaintiff's right to equal protection under the Fourteenth Amendment.

## EQUAL PROTECTION UNDER LOUISIANA CONSTITUTION

The Louisiana Constitution states that: "no law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of.... physical condition." La. Const. Art. 1, § 3. Even under this heightened scrutiny, the Court finds that defendants' actions were constitutional. The state had a substantial and compelling interest in preventing the spread of HIV infection or AIDS to hospital patients and co-workers, in preventing the spread of highly contagious diseases to HIV victims with impaired immune systems, and insuring that health care workers can safely and adequately perform their jobs.

## RIGHT TO PRIVACY

■ The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A public employer's intrusion on an individual's constitutionally protected privacy interest for work-related purposes is judged by a standard of reasonableness under all the circumstances. *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Public employees' expectations of privacy may be reduced by their employers' practices and procedures. *Id.* at 1498; *see also, National Treasury Employees' Union v. Von Rabb*, 816 F.2d 170 (5th Cir. 1988).

■ TGMC had longstanding infection control practices and procedures of which plaintiff was not only aware, but had voluntarily submitted to during his eight-year employment with TGMC. The practices and procedures required nursing personnel to inform TGMC of their health status and to undergo testing for actual or suspected infection. Where employees were exposed to infectious diseases, culture and sensitivity testing was conducted to determine if the employee had contracted the disease.

Given these longstanding infection control practices and procedures, and plaintiff's admitted long-term relationship with an individual who had died of AIDS, plaintiff did not have a reasonable expectation of privacy with regards to his test results.

A determination of the standard of reasonableness applicable to a particular class of searchers requires 'balancing the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the [state's] interests alleged to justify the intrusion.' *O'Connor*, at 1499. In evaluating the nature and quality of the search, the court "must consider the scope of the particular intrusion, the manner in which it was [conducted], the justification for initiating it, and the place it [was] conducted." *Von Rabb, supra*, 816 F.2d at 176; *Transport Workers, Local 234 v. Southeastern Pennsylvania Transportation Authority*, 863 F.2d 1110 (3rd Cir.1988). Defendants had no control over either the manner in which the test was conducted or the place in which the test was conducted. Here, the defendants asked only for results of a test plaintiff admitted he had taken voluntarily.

In *Von Rabb*, supra the 5th Circuit noted that a public employer such as the government, may exact from its employees what it may not require of others. "Work-related searches that are mostly incident to the primary business of an agency may satisfy the Fourth Amendment's reasonableness requirement." *Id.* at 178. Public employees may be subject to searches that would be impermissible in the absence of the employment relationship so long as the searches are reasonably aimed at legitimate governmental purposes. *Id.*

The state interest asserted by the defendants here, that of guaranteeing the safety from infectious diseases of patients utilizing the defendants' institution and providing a safe and efficient workplace to both plaintiff and other employees, has been recognized by both the Supreme Court and the Fifth Circuit as a strong governmental interest. *See* e.g., *Von Rabb*, supra; *O'Connor*, supra. In *Transport Workers Local*

*234, supra*[9], the court noted that "the state interest of guaranteeing the safety of the public has been accepted as justifying drug testing without particularized suspicion."

Public employees such as nurses, who are employed in full service health care facilities, are entrusted with tremendous responsibility and the consequences of their health status to the public interest can be severe. Nurses are in the quintessential "safety sensitive" position with regards to the public's use of hospitals. The health status of an employee who is in constant daily contact with debilitated and pre and post-surgical patients, as well as patients undergoing invasive procedures and patients with open routes to their blood systems, is of primary importance in light of the knowledge that AIDS is a terminal disease.

In the present case, there was a need to guard the safety not only of plaintiff's co-workers, but the patients with whom plaintiff had contact and of plaintiff himself. Defendants' request for plaintiff's test results was the first step in the process designed to insure that plaintiff would not transmit HIV to someone else, would not contract a disease which might be fatal or disabling to plaintiff because of his possibly impaired immune system, and would otherwise be fit to perform his job. Defendants' interest in knowing plaintiff's health status far outweighed the limited intrusion of requiring him to produce the results of a test he had already taken voluntarily. The Court concludes that the infection control policies of TGMC requiring testing of employees exposed to infectious diseases satisfies the "reasonableness under all the circumstances" test set forth in *O'Connor.*

The Eighth Circuit Court of Appeals has recently held that an HIV antibody testing and reporting requirement, which applied to all health care employees, violated the Fourth Amendment. In *Glover v. Eastern Nebraska Community Office of Retardation*, 867 F.2d 461 (8th Cir.1989), the defendants conditioned the retention of employment of health care workers, including an LPN and registered nurse, on their undergoing a medical examination to determine whether they were HIV seropositive and reporting the results of that medical examination to the defendant. However, in *Glover* the policy required testing of *all* employees for AIDS and hepatitis B virus in certain designated job descriptions. The defendant in *Glover*, the Eastern Nebraska Community Office of Retardation, a sub-agency of the Eastern Nebraska Human Service Agency (ENHSA), is a community-based program which provided residential, vocational and other specialized services for the mentally retarded. ENHSA was not a full service health care facility which provided care to debilitated or surgical patients. Nor did ENHSA conduct surgical or invasive procedures on their residents. Accordingly, the nurses and employees of ENHSA were not in the "safety sensitive" position as held by the plaintiff in this case.

The Court concludes that the defendants did not violate plaintiff's Fourth Amendment rights to privacy. Likewise, the defendants did not violate plaintiff's right of privacy under the Louisiana Constitution.

Judgment shall be rendered accordingly.[10]

9. There, the Third Circuit found that random drug testing of state mass transit agency employees in "safety sensitive" positions is reasonable in light of the state's interest in public safety. The Court held that testing did not violate employees' Fourth Amendment rights.

10. Notwithstanding the Court's dismissal of plaintiff's claims, this Court does not find plaintiff's action to be so frivolous, unreasonable, or without foundation so as to require the award

of attorney's fees to the prevailing defendants; the Court exercises its discretion to deny such fees. *See* Civil Rights Attorney's fees Awards Act of 1976, 42 U.S.C. § 1988 (1982); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The costs, however, may still be awarded to the prevailing defendants even if not entitled to attorney's fees. *See* F.R.Civ.P. 54(d); *Jones v. City of San Antonio*, 568 F.2d 1224, 1226 (5th Cir.1978). *See*

*generally* 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure: Civil* § 2666, at 173–74 (2d ed. 1983) (distinguishing costs, expenses, and attorney's fees).