Kevin M. LECKELT,
Plaintiff–Appellant,

v.

BOARD OF COMMISSIONERS OF HOSPITAL DISTRICT NO. 1, et al., Defendants–Appellees.

No. 89–3256.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1990.

R. James Kellogg, Lambda Legal Defense & Educ. Fund, Ruth Colker, New Orleans, La., Nan D. Hunter, New York City, and Maureen O'Connell, and Ann McClaine, New Orleans, La., for plaintiff-appellant.

Daniel J. Walker, Ann Mallett Barker, and Wm. S. Watkins, Watkins and Walker, Houma, La., K. Bruce Stickler, Keck, Mahin & Cate, Chicago, Ill., Elmer E. White, III, Kullman, Inman, Bee & Downing, New Orleans, La., and Andrew B. David, Sugar, Friedberg & Felsenthal, Chicago, Ill., for defendants-appellees.

James Monroe Smith, Executive Director, Aids Legal Council, Chicago, Ill., for Aids Legal Council of Chicago, amici in support of plaintiff-appellant.

Herbert Semmel, New York Lawyers for the Public Interest, and Mark Barnes, Asst. Clinical Prof. of Law, New York City, for American Public Health Assoc.

John T. O'Keefe, Cambridge, Mass., for American Soc. of Law & Medicine.

Robert L. Roland and Cathryn S. Long, Watson, Blanche, Wilson & Posner, Baton Rouge, La., for Louisiana Hosp. Assoc., amicus in support of defendants-appellees.

Before GEE, REAVLEY, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Kevin Leckelt (Leckelt), formerly a licensed practical nurse at Terrebone General Medical Center (TGMC), a local governmental hospital located in Houma, Louisiana, appeals the dismissal, following a bench trial, of his claim that his rights under various federal and state constitutional and statutory provisions were violated by TGMC's requirement that he submit the results of his human immunodeficiency virus (HIV) antibody test, its refusal to permit him to work pending the submission of these test results, and its ultimate discharge of him for failure to submit the results as directed. *See Leckelt v. Board of Commissioners of Hospital District No. 1*, 714 F.Supp. 1377 (E.D.La.1989). We affirm.

### Facts and Proceedings Below

In June 1978, TGMC hired Leckelt as a licensed practical nurse. In this capacity, Leckelt routinely administered medication, orally and by injection, changed dressings, performed catheterizations, administered enemas, and started intravenous tubes (IVs). Leckelt occasionally was assigned to the intensive care unit, the emergency room, or the surgical recovery room. Leckelt routinely wore gloves for sterile procedures, such as catheterizations or dressing changes. When starting IVs or giving injections, he used a hand wash but did not wear rubber gloves unless he had a cut, abrasion, or open wound on his hands.[1]

---

1. Gladys Verbus (Verbus) testified that following her knee surgery at TGMC in January 1984, Leckelt removed bandages around Verbus' surgical incision, manipulated her wound, and reinserted an IV. She indicated that he did so without wearing gloves, even though he had a cut on his finger that was covered with a blood-soaked adhesive bandage and a paper towel. Verbus was under the effect of various medications when she made these alleged observations. The district court found "the full extent of Verbus' testimony to be unlikely." *See Leckelt*, 714 F.Supp. at 1383. The court, however, also found that Leckelt "did not utilize barrier precautions (gloves) during his care of Gladys Verbus' interenous [*sic*] line and surgical wound." *Id.* Further, one of Leckelt's experts— Dr. Theodore Eickhoff (Dr. Eickhoff)—conceded on cross-examination that health care workers "occasionally"—explained as being about five to ten percent of the time—do not use

On April 4, 1986, Dr. James Nelson (Dr. Nelson), the vice chief of staff of TGMC, brought a report of the infection control committee of TGMC's medical staff to Alex Smith (Smith), the executive director of TGMC. The report reflected the committee's concern over the need for a policy specifically addressing employees with HIV.[2] Dr. Nelson informed Smith that Dr. Amelia Eschete (Dr. Eschete), the chairperson of the committee, had stated that she knew of a hospital employee who was the associate of a current AIDS patient at TGMC. Smith immediately initiated an investigation into the matter. In the meanwhile, Smith consulted legal counsel, familiarized himself with the hospital's infection control policies, and read various excerpts of the applicable guidelines with respect to HIV and AIDS of the Center for Disease Control (CDC) and of the American Hospital Association (AHA). Smith understood that in order to comply with these guidelines, TGMC needed to know whether the employee was seropositive for HIV antibodies and, therefore, needed to be counseled and evaluated in conjunction with the employee's personal physician.

On April 7, TGMC's board of commissioners (board) held its monthly meeting. During an executive session, Smith informed the board that there was a male TGMC nurse who was known to be homosexual and who was the roommate of a TGMC patient believed to have AIDS. He also informed the board that he had consulted with legal counsel and that it was his understanding that TGMC needed to know whether the employee was seropositive for HIV antibodies in order to comply with the CDC guidelines. Smith recommended that

the employee be requested to submit to HIV antibody testing.[3] The board concurred with Smith's recommendation. Smith and the board briefly discussed what measures might be taken if the employee did test seropositive to HIV antibodies, including additional universal precautions, reassignment, or termination. Because they did not know whether the male nurse in question was seropositive for HIV antibodies, however, they did not decide what measure or measures would be appropriate in such a case.

Subsequent to the board meeting, Smith met with Mabel Russell Michel (Michel), TGMC's director of nursing services. Michel informed Smith that the nurse in question was Leckelt, that Leckelt was known to be homosexual, and that he had been the roommate for eight years of Marvin Potter (Potter), a patient of TGMC who was believed to have AIDS.[4] Smith advised Michel to speak with Gustavia Growe (Growe), TGMC's infection control practitioner, concerning this matter and to instruct her to request Leckelt to submit to HIV antibody testing for the protection of Leckelt and TGMC's patients. Michel did so.

On April 8, Growe called Leckelt at home and asked him if he could meet with her that afternoon. Leckelt did so. At this meeting, Growe informed Leckelt that she knew that Leckelt was a roommate of Potter. She explained that TGMC was concerned about the health of Leckelt and that of its patients and, therefore, requested that Leckelt consent to HIV antibody testing. Leckelt responded that he likewise was concerned about his health and that he

---

the recommended universal or barrier precautions.

2.  HIV is a retrovirus believed to cause acquired immunodeficiency syndrome (AIDS). HIV attacks a person's immune system, making that person more susceptible to certain opportunistic infections. A person with AIDS has HIV and one or more of these infections.

3.  In April 1986, two tests were available to test a person's exposure to HIV. Both of these tests detect antibodies of HIV. A person exposed to HIV may not develop antibodies of HIV or

seroconvert until several weeks or months after exposure. For example, according to the trial testimony of one of Leckelt's experts—Dr. Eickhoff—a person usually seroconverts within two to six weeks after exposure. Currently there is no commercially available HIV antigen test—i.e., a test that detects the actual existence of HIV, as opposed to antibodies that develop in response to HIV exposure.

4.  Shortly thereafter, Potter was diagnosed with AIDS. Subsequently, on April 9, he was transferred to another hospital. On April 21, he died of AIDS-related complications.

and a few friends had gone to New Orleans to be HIV tested. Growe asked Leckelt if he would bring the results of his HIV antibody test to her. Leckelt responded that he was going to pick up the results on April 11 and that he would bring the results to her on that day.

During this April 8 meeting, Leckelt also informed Growe that he had had a cyst underneath one of his arms that had been lanced at the TGMC emergency room on April 6. Because of the resulting draining lesion, he explained that he had called in sick on April 7. Growe responded that Leckelt should not work at TGMC with that type of lesion. She explained that he would need to receive medical clearance from his treating physician—a Dr. Carmody—before reporting back to work.

On April 11, Growe called Leckelt at home concerning the results of his HIV antibody test. Leckelt informed Growe that he had not returned to New Orleans to pick up the test results. He also indicated that he did not believe that any law required him to divulge the test results and that he was concerned about losing his job if he were seropositive. Growe relayed this conversation to Michel, who in turn relayed it to Smith. As reflected in the following April 11 file memorandum by Smith that was admitted as evidence at trial, Smith decided that Leckelt

"will not be scheduled to work until we have the results of his exam.... [S]hould the employee present himself with the results of his tests and if he was tested positive for the AIDS virus, he should be placed on an immediate leave with pay pending further review and advice from legal counsel and the Hospital

Board. If he refuses to present said information or retake the exam at our request, he is to be scheduled off and suspended pending termination review for insubordination."

Smith relayed this decision to Michel, who in turn relayed it to Growe.

Later that day, Growe contacted Leckelt at Dr. Carmody's office. Growe told Leckelt that he could not return to work until he submitted the results of his HIV antibody test to her. She reminded him that he also needed medical clearance with respect to the draining lesion before returning to work. Shortly thereafter, Leckelt called Growe and informed her that he had received medical clearance with respect to the lesion and that he could return to work on April 14. Growe reiterated that before Leckelt could return to work, he. must bring his test results to her between 8:30 a.m. and 4:30 p.m. on any weekday.

At an infection control committee meeting on April 14, Dr. Eschete indicated that there was a TGMC employee who was a hepatitis B virus (HBV) carrier and had a history of syphilis. Following the meeting, Growe asked Dr. Eschete whether the employee in question was Leckelt, and Dr. Eschete replied affirmatively.[5] Growe investigated Leckelt's medical records at TGMC and discovered that he had been admitted in February 1984 for a lymph node biopsy and was diagnosed with general lymphadenopathy. His medical chart noted blood precautions.[6] Further, in December 1984, Leckelt had reported to Growe with a rash that was diagnosed as a syphilis infection.[7] Growe relayed this information concerning Leckelt's medical his-

---

5. Leckelt contracted HBV in 1980. Dr. Eschete treated him for this virus.

6. The August 1987 CDC guidelines state that lymphadenopathy may be indicative of recent HIV infection. Leckelt conceded at trial that Dr. Eschete, his treating physician for this condition, had advised him that lymphadenopathy may be related to AIDS. Leckelt never informed Growe of this fact. Although evidence was presented that Dr. Eschete had suggested to Leckelt that he should take a HIV antibody

test, Leckelt could not recall Dr. Eschete's having made such a suggestion.

7. Growe referred Leckelt to Dr. Eschete for treatment. Dr. Eschete apparently notified Growe of her treatment of this syphilis infection in December 1984 and in February 1985. Leckelt was placed on medical leave following each treatment.

At trial, evidence was presented that Leckelt also had been treated for such a syphilis infection in March 1985. Growe was never informed of this fact by Leckelt (or anyone else).

tory to Michel, who in turn relayed it to Smith.

On April 16, Growe, having not heard from Leckelt in the meanwhile, contacted him concerning whether he was going to submit the results of his HIV antibody test. Leckelt responded that he was on the other line with his attorney and, therefore, could not speak with her at that time. Neither Leckelt nor Growe contacted or attempted to contact the other after April 16. It is undisputed that as of the conclusion of the proceedings in the district court, Leckelt had never picked up his test results and they had never been furnished to TGMC. There is no contention that the test results were other than readily available to Leckelt.

TGMC nursing staff coordinators continued to schedule Leckelt for work—namely, on April 16, 17, 21, 22, 25, 26, and 27. Prior to each of the series of consecutive days during which he was scheduled to work, Leckelt apparently called the nurse supervisor on duty and asked if he still needed to bring in the test results in order to work. On each occasion, he apparently was informed that he could not return to work unless he did so.

By April 28, Smith was of the belief that Leckelt was not going to submit the results of his HIV antibody test. He, therefore, decided to terminate Leckelt for failure to comply with hospital policies—namely, failure to submit the test results to Growe, and failure to call her before each time that he was scheduled to work and tell her that he could not work because he was not going to submit the test results. Smith relayed this decision to William Miller (Miller), TGMC's director of human resources, who in turn informed Leckelt of his termination and the reasons for it at his termination hearing on the following day. Leckelt was discharged effective May 1, 1986.[8]

On September 29, 1986, Leckelt filed a claim against defendants-appellees the Board of Commissioners of Hospital District No. 1, Terrebone Parish, Louisiana, the individual commissioners, Smith, Michel, Growe, and Miller. Leckelt alleged that TGMC's requirement that he submit the results of his HIV antibody test, its refusal to permit him to work pending the submission of his test results, and its discharge of him for failure to submit the results violated his civil rights under various federal and Louisiana constitutional and statutory provisions. After the completion of discovery, Leckelt and the defendants filed cross-motions for summary judgment, which the district court denied. Thereafter, following a bench trial, the court filed written findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rule of Civil Procedure and rendered judgment in favor of the defendants on all of the causes of actions asserted. The court concluded:

"Because a hospital has a right to require such testing [of an employee whom it learns has a high medical risk of such infectious diseases as HIV] in order to fulfill its obligation to its employees and to the public concerning infection control and health and safety in general, plaintiff's employer was justified in terminating him [for refusing to provide the results of his HIV antibody test]." *Leckelt*, 714 F.Supp. at 1379.

This appeal followed.

## Discussion

I. *Federal Rehabilitation Act of 1973*

Leckelt primarily challenges the district court's judgment against him on his claim under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[9] Leckelt contends that he was discriminated against on the basis of a perceived handicap, in viola-

---

**8.** Leckelt was paid for forty hours of vacation time and twenty hours of sick time for this final period during which he was not allowed to work because of his failure to submit his test results.

**9.** It is undisputed that the hospital service district is a state governmental entity that operates and governs TGMC, and that TGMC receives federal financial assistance so as to be subject, so far as here relevant, to the provisions of 29 U.S.C. § 794.

tion of section 504.[10] Section 504 prohibits a federally funded program from discriminating against an otherwise qualified handicapped individual solely because of the individual's handicap. *See* 29 U.S.C. § 794; *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987). In the present case, the district court determined that Leckelt failed to prove any of the following three elements of his section 504 claim: (1) that he was regarded as being handicapped; (2) that he was discriminated against solely because of this perceived handicap; and (3) that he is otherwise qualified as a licensed practical nurse.[11]

### A. Regarded as handicapped

The threshold issue of a section 504 claim is whether the plaintiff is handicapped as defined in the Rehabilitation Act. A handicapped individual under section 504 is defined as

> "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, *or* (iii) *is regarded as having such an impairment.*" 29 U.S.C. § 706(7)(B) (emphasis added).

**10.** Purportedly pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, Leckelt has submitted an investigative report with respect to his section 504 claim issued by the Office of Civil Rights of the United States Department of Health & Human Services on December 13, 1989. Because the district court did not consider this administrative report, Leckelt has not sought to reopen the proceedings below for consideration of it, and such report does not constitute the type of legal authority that we should consider at this stage, we grant appellees' motion to strike this submission.

**11.** The district court adopted the shifting burden of production analysis set forth in *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372 (10th Cir.1981). *See id.* at 1386–87 (adopting a modified version of the Title VII disparate treatment analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also Doe v. Region 13 Mental Health–Mental Retardation Comm'n*, 704 F.2d 1402, 1408 n. 6 (5th Cir.1983) (citing *Pushkin* "[f]or a discussion of the appropriate presentation of proof in section 504 cases"). According to *Pushkin,*

The phrase "is regarded as having such an impairment" means, *inter alia*, "is treated ... as having such an impairment." *See* 45 C.F.R. § 84.3(j)(2)(iv)(C) (1989); *Carter v. Orleans Parish Pub. Schools*, 725 F.2d 261, 262–63 (5th Cir.1984) (per curiam). For purposes of this appeal, we *assume* that seropositivity to HIV antibodies is an impairment protected under section 504 and that TGMC officials treated Leckelt as though he had such an impairment. *Cf. Arline*, 107 S.Ct. at 1128 n. 7 (not reaching "the questions whether a carrier of a contagious disease such as AIDS could be considered to have a physical impairment, or whether such a person could be considered, solely on the basis of contagiousness, a handicapped person as defined by the Act").

### B. Discriminated against solely because of his perceived handicap

A section 504 plaintiff must prove that he was discriminated against *"solely* by reason of" his handicap (or perceived handicap). 29 U.S.C. § 794 (emphasis added); *see Norcross v. Sneed*, 755 F.2d 113, 117 n. 5 (8th Cir.1985) ("[I]t is significant that the section 504 plaintiff must show that handicap was the *sole* reason for the decision, while the Title VII plaintiff pursuing a

> "1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person *apart from* his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely on his handicap;
> "2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements *in spite of* his handicap, or that his rejection from the program was for reasons other than his handicap;
> "3) The plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants' reasons for rejecting the plaintiff are based on misconceptions or unfounded factual conclusions, and that reasons articulated for the rejection other than the handicap encompass unjustified consideration of the handicap itself." 658 F.2d at 1387 (emphasis in original).
> *Accord Reynolds v. Brock*, 815 F.2d 571, 574 (9th Cir.1987).

disparate treatment claim need only show that a protected classification was *a factor* influencing the decision." (emphasis in original; citations omitted)). The district court concluded that Leckelt "was discharged because he had violated the hospital infection control policies on reporting infectious or communicable diseases, and not because he was regarded as being seropositive for HIV." *Leckelt,* 714 F.Supp. at 1387.

In order to protect patients and employees from the spread of communicable diseases, health care facilities, such as TGMC, have promulgated infection control policies based on the guidelines of the CDC and the AHA. As the district court found "TGMC did not have a specific written policy concerning HIV infection or AIDS, but had infection control procedures regarding communicable and infectious diseases which would encompass HIV or AIDS." *Id.* at 1379. TGMC's policies required employees to report any exposure to infectious diseases to the infection control practitioner—Growe—and, where appropriate, to undergo testing and working restrictions for such diseases. For example, an employee exposed to HBV—a blood-borne disease like HIV—was required to undergo testing, and if the test results were positive, to take at least a three-week leave of absence. After receiving medical clearance, such an employee could return to active employment. At trial, Leckelt testified that he understood that TGMC employees were required to report infections to Growe. Leckelt reflected this knowledge by reporting a draining lesion to Growe in April 1986 and, apparently, by reporting to her in December 1984 a rash diagnosed as syphilis. TGMC's employee handbook stated that employees committing serious infractions of TGMC policy, including insubordination, were subject to immediate termination. Leckelt had signed a statement that he had read and understood this handbook.

■ Smith knew that Leckelt had been the roommate for eight years of a TGMC patient—Potter—who died of AIDS-related complications, and that Leckelt was known to be homosexual.[12] It is undisputed, and indeed virtually common knowledge, that homosexuals are a high risk group for contracting HIV and AIDS. Further, Smith discovered that Leckelt was an HBV carrier and had a history of syphilis and lymphadenopathy (a condition that is symptomatic of recent HIV infection), and that Leckelt had failed to report at least some of these matters to Growe. Smith reasonably suspected that Leckelt had been exposed to HIV and, therefore, determined that TGMC needed to know Leckelt's HIV status in order to determine what, if any, precautions were necessary. An April 11, 1986 memorandum by Smith reflects that if Leckelt tested positive for HIV antibodies, he would be placed on leave with pay pending further review; and if he refused to submit his test results, he would be suspended, pending termination review, for insubordination. Although Smith and the TGMC board discussed the possibility of termination, among other alternatives, if Leckelt tested seropositive for HIV antibodies, no decision was ever made as to what measures would be taken in such a case. When it became apparent that Leckelt was not going to submit his test results, he was terminated for failure to comply with hospital policy. Thus, the district court was not clearly erroneous in finding that Leckelt failed to establish that he was discriminated against *solely* because of a perception that he was infected with HIV.

■ Leckelt contends that the purported reason for his dismissal—failure to comply with hospital policy by not submitting the results of his HIV antibody test—was a pretext for his termination because of the perception that he was infected with HIV. Leckelt points to the disparity in TGMC's treatment of him as opposed to that of a registered nurse (RN) who had been stuck by a needle contaminated with Potter's blood in late March or early April 1986. When Leckelt did not submit the results of

---

12. Michel and Growe testified at trial that it was "accepted" by hospital employees that Leckelt was homosexual. Leckelt neither contests the validity of this perception of his sexual preference nor contends that TGMC officials discriminated against him because of this perception.

his HIV antibody test on April 11, 1986, Smith decided that Leckelt would not be allowed to work until he submitted his test results to Growe. The RN, on the other hand, was allowed to continue working while she awaited the results of her HIV antibody testing. Leckelt emphasizes that an individual who has contracted HIV likely would not have seroconverted until several weeks or months after his initial exposure to HIV.

Any disparity in the hospital's treatment of Leckelt and the RN, however, may be explained by the fact that the RN, unlike Leckelt, complied with Growe's request that she undergo HIV antibody testing and submit her results to Growe. Further, Leckelt, unlike the RN, had already, as a result of his own health concerns, taken an HIV antibody test by the time that Growe requested that he submit to such a test. Thus, even though Leckelt was not allowed to work until he submitted his test results, he, unlike the RN, did not have to await these results for any meaningful period of time. Leckelt represented that he could have picked up these results on April 11— the same day on which Smith decided that Leckelt could not work until he submitted his test results to Growe. At that time, Leckelt was on leave from work because of a draining lesion (there was no indication that the RN had any adverse medical condition when the decision concerning her was made). Leckelt did not receive medical clearance with respect to the lesion until April 14, and was not otherwise scheduled to work until April 16. Further, the evidence supports the conclusion that Leckelt, unlike the RN, was known to be a homosexual, a group at high risk for contracting HIV and AIDS. Therefore, there is adequate evidence that TGMC reasonably suspected that Leckelt had been exposed to HIV at some point during his eight-year relationship with Potter, who suffered from (and soon died of) AIDS-related complications. It could reasonably be conclud-

ed that, if Leckelt were infected with HIV, there probably was an enhanced likelihood, as compared to the RN when she was tested, that Leckelt would have seroconverted by the time that he voluntarily submitted to HIV antibody testing in New Orleans. We are unable to conclude that the district court was clearly erroneous in finding that Leckelt did not establish pretext.

C. "Otherwise qualified"

█ Finally, a section 504 plaintiff must show that, notwithstanding his handicap (or the perception of being handicapped), he is "otherwise qualified" for the position in question. 29 U.S.C. § 794; *see Arline*, 107 S.Ct. at 1131 n. 17 ("In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question." (Quoting 45 C.F.R. § 84.3(k) (1985)).[13] As the Supreme Court pointed out in *Arline*, "courts normally should defer to the reasonable medical judgments of public health officials" in making this inquiry. 107 S.Ct. at 1131 & n. 18 (not addressing "whether courts should also defer to the reasonable medical judgments of private physicians on which an employer has relied"). The district court determined that because Leckelt "would not allow defendants to conduct the inquiry necessary to protect patients, co-workers and plaintiff himself from any possible risk he may pose because of his particular situation, defendants had a reasonable belief that plaintiff was not 'otherwise qualified' for employment at TGMC." *Leckelt*, 714 F.Supp. at 1389. We will not reverse such a finding of fact unless it is clearly erroneous. *See Brennan v. Stewart*, 834 F.2d 1248, 1260–62 (5th Cir.1988).

According to the district court's adequately supported findings, HIV is transmitted through intimate sexual contact, exposure to infected blood or blood components, or perinatally from mother to neonate.[14] As many as one hundred percent of

---

13. This inquiry is "interrelated" with the previous one, "since if the individual is not otherwise qualified he cannot be said to have been rejected solely because of his handicap." *Pushkin*, 658 F.2d at 1385.

14. Leckelt challenges the district court's statement that research continues with respect to the possibility of other modes of HIV transmission even though one of his experts—Dr. Louise McFarland—testified at trial, "Well certainly we

those persons infected with HIV may become symptomatic of AIDS. At this time, there is no known cure for AIDS. Thus, a person diagnosed with AIDS may be regarded as terminally ill.

Under the November 1985 CDC guidelines, *asymptomatic* health care workers who are not involved in *invasive* procedures need not be subjected to *routine mandatory* HIV antibody testing because of the extremely low risk that such health care workers could transmit HIV to patients, which can be further minimized with the use of appropriate universal precautions.[15] If a health care worker has a parenteral exposure (*e.g.*, needle stick or cut) or a mucous membrane exposure (*e.g.*, splash to the eye or mouth) to the blood or body fluids of a patient, and if the patient is seropositive for HIV antibodies or refuses to consent to a HIV antibody test, these CDC guidelines state that the health care worker *should* be evaluated clinically and *serologically* for evidence of HIV infec-

tion.[16] Dr. Peter Mansell (Dr. Mansell), the defendants' expert in infection control, testified that this protocol should be followed regardless of whether health care workers are exposed to HIV inside or outside of the health care facility. Noting that health care workers infected with HIV and with defective immune systems are at an increased risk of contracting other infectious diseases from patients, the CDC guidelines also recommended that a health care worker infected with HIV should be counseled concerning the risks of infection and that the employer, in conjunction with the health care worker's personal physician, should determine what duties the health care worker can adequately and safely fulfill.[17] All of the infection control experts testifying at trial stated that this latter recommendation could not be fulfilled without knowledge of the HIV status of the health care worker in question. In January 1986, the AHA articulated guidelines

have been aware of modes of transmission as far back as '79 and '80. There still continued to be a lot of research until—well, we will always continue to look at other possibilities of other modes of transmission."

**15.** The August 1987 CDC guidelines defined invasive procedures as surgical entry into tissues, cavities, or organs, or repair of traumatic injuries in a variety of settings. Contrary to Leckelt's suggestion otherwise, the evidence does not establish that at the time of Leckelt's discharge either the CDC or the AHA had indicated that health care workers reasonably suspected of being infected with HIV ought not be subject to *limited mandatory* testing.

**16.** The CDC guidelines in this respect provide in part:

"If a[n] HCW has a parenteral (e.g. needlestick or cut) or mucous membrane (e.g. splash to the eye or mouth) exposure to blood or other body fluids, the source patient should be assessed clinically and epidemiologically to determine the likelihood of HTLV–III/LAV infection. . . . If the source patient has AIDS or other evidence of HTLV–III/LAV infection, declines testing, or has a positive test, the HCW should be evaluated clinically and serologically for evidence of HTLV–III/LAV infection as soon as possible after the exposure, and, if seronegative, retested after 6 weeks and on a periodic basis thereafter (e.g. 3, 6 and 12 months following exposure) to determine if transmission has occurred. During this follow-up period, especially the first 6–12 weeks, when most infected persons are ex-

pected to seroconvert, exposed HCWs should receive counseling about the risk of infection and follow U.S. Public Health Service (PHS) recommendations for preventing transmission of AIDS (20, 21). . . . If the source patient cannot be identified, decisions regarding appropriate follow-up should be individualized based on the type of exposure and the likelihood that the source patient was infected."

**17.** The CDC guidelines include the following:

"Of particular concern is the risk of severe infection following exposure to patients with infectious diseases that are easily transmitted if appropriate precautions are not taken (e.g. tuberculosis). HCWs infected with HTLV–III/LAV should be counseled about the potential risk associated with taking care of patients with transmissible infections and should continue to follow existing recommendations for infection control to minimize their risk of exposure to other infectious agents (18, 19). The HCWs' personal physician(s), in conjunction with their institutions personnel health services or medical directors, should determine on an individual basis whether the infected HCWs can adequately and safely perform patient-care duties and suggest changes in work assignments, if indicated. In making this determination, recommendations of the Immunization Practices Advisory Committee and institutional policies concerning requirements for vaccinating HCWs with live-virus vaccines should also be considered."

almost identical to those of the CDC discussed above.[18]

Although noting that there is some debate in the medical community as to whether starting IVs is an invasive procedure, the district court did not expressly find that any of Leckelt's duties required his involvement in invasive procedures (contrary to Leckelt's suggestion otherwise). Nevertheless, the court found that some of Leckelt's duties—namely, starting IVs, injecting medication, performing catheterizations, changing dressings, and administering enemas—provided routes to a patient's blood and body fluids and, therefore, were potential opportunities for HIV transmission. The court also noted that Leckelt's occasional assignments to the emergency room would bring him into contact with patients experiencing a high degree of trauma.

Leckelt contends that it was not necessary for TGMC to require that he submit the results of his HIV antibody test because even if he were infected with HIV, he would not have posed a significant risk of transmission as a licensed practical nurse. At first glance, *Arline* seems to require that district courts make a specific finding in this respect. *See Arline*, 107 S.Ct. at 1131 n. 16 ("A person who poses a *significant risk* of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." (emphasis added)). It is clear, however, that the probabilities of whether an infectious disease will be transmitted is but one of four relevant factors:

"In the context of the employment of a person handicapped with a contagious disease, ... [the "otherwise qualified"] inquiry should include:

'[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.'" *Id.* at 1131 (citation omitted).

Even though the probability that a health care worker will transmit HIV to a patient may be extremely low and can be further minimized through the use of universal precautions, there is no cure for HIV or AIDS at this time, and the potential harm of HIV infection is extremely high.

Leckelt emphasizes that so long as he followed the appropriate universal precautions, there was little to no risk of transmitting HIV to patients. Although none of Leckelt's duties apparently fell within the technical definition of an invasive procedure, at least some of these duties provided potential opportunities for HIV transmission to patients. Leckelt and the defendants stipulated that Leckelt generally complied with TGMC's policies concerning universal precautions. Some evidence was presented, however, that even though Leckelt may have had a cut on one of his fingers, he failed to wear rubber gloves (or take equivalent precautions) in changing the dressing on a surgical wound and adjusting an IV of a patient in 1984. One of

18. The AHA guidelines state in part:
"If an individual has a parenteral (e.g. needlestick, cut, or bite) or mucous membrane (e.g. splash to the eye or mouth) exposure to blood or other body fluids, the source patient should be assessed clinically and epidemiologically to determine the likelihood of HTLV–III/LAV infection.... If the source patient has AIDS or other evidence of HTLV–III/LAV infection, declines testing, or has a positive test, the exposed individual should be evaluated clinically and serologically for evidence of HTLV–III/LAV infection as soon as possible after the exposure, and, if seronegative, retested after 6 weeks and on a periodic basis thereafter (e.g. 3, 6, and 12 months following exposure) to determine if transmission has occurred. During this follow-up period, especially the first 6–12 weeks, when most infected persons are expected to seroconvert, exposed individuals should receive counseling about the risk of infection and follow U.S. Public Health Service (PHS) recommendations for preventing transmission of AIDS....
"... If the source patient cannot be identified, decisions regarding appropriate follow-up should be individualized based on the type of exposure and the likelihood that the source patient was infected."

Leckelt's experts—Dr. Eickhoff—also testified that approximately five to ten percent of the time health care workers do not comply with recommended universal precautions. Further, it is clear that well prior to Leckelt's discharge, Smith discovered that Leckelt had a medical history of HBV, syphilis, and lymphadenopathy (a condition that is symptomatic of recent HIV infection), and that by failing to report at least some of these facts to Growe, Leckelt had violated TGMC's infection control policies.

One of the essential practices of health care facilities, such as TGMC, is to establish and enforce policies and procedures for controlling the risk of transmission of infectious diseases. Although TGMC did not have a written policy specifically applicable to HIV infection or AIDS, it generally required that health care workers report exposure to infectious diseases and undergo testing and work restrictions where necessary. These policies were based on the CDC and AHA guidelines. According to Smith's trial testimony, when he was apprised of Leckelt's relationship with Potter, he consulted legal counsel, familiarized himself with the hospital's infection policies, and read excerpts of the CDC and AHA guidelines. As noted, the then applicable CDC guidelines recommended that a health care worker relevantly exposed to the blood or body fluids of a patient infected with HIV should be tested for the presence of HIV antibodies. As Dr. Mansell testified, there is no logical reason that this guideline should be restricted to HIV exposure in the hospital setting. The CDC guidelines also recommended that a health care worker infected with HIV should be counseled about the risks of infection and that the facility, in conjunction with the health care worker's personal physician, should determine what duties the health care worker could safely perform. As Smith concluded, it is clear that TGMC could not comply with these guidelines without first knowing Leckelt's HIV status.

In *Arline*, the Supreme Court stated, "Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee." 107 S.Ct. at 1131 n. 19. For example, employers "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *Id.* (citations omitted). Assuming that Leckelt had tested seropositive for HIV antibodies and that such an impairment is protected under section 504, TGMC might have modified Leckelt's duties (or use of universal precautions) in order to reduce the risk of HIV transmission to others or to decrease the risk of Leckelt's exposure to other infectious diseases of patients. If nothing else, TGMC might have monitored Leckelt's health status and compliance with universal precautions on a periodic basis to determine whether he could adequately and safely fulfill his duties. By refusing to submit the results of his HIV antibody test, Leckelt prevented TGMC from ever knowing his HIV status and from deciding what, if any, measures were necessary to protect the health of Leckelt, other TGMC employees, and TGMC patients. In other words, Leckelt prevented TGMC from knowing whether he had a handicap for which federal law arguably required reasonable accommodations. Accordingly, we conclude that the district court was not clearly erroneous in finding that Leckelt was not "otherwise qualified" to perform his job as a licensed practical nurse because of his failure to comply with TGMC's policies for monitoring infectious diseases, such as HIV.[19]

19. Leckelt also argues on appeal that TGMC's requiring him to submit the results of his HIV antibody test constitutes an independent discriminatory act under section 504. In making this argument, Leckelt relies on 45 C.F.R. §§ 84.11(a)(3) and 84.13(a) (1989), which provide that employers covered by section 504 cannot classify employees on the basis of handicap and use selection criterion that are not job related. Leckelt made a similar argument below, based on section 84.14, which the district court properly rejected because that section on its face prohibits only certain *pre-employment* medical exams or inquiries of applicants regarding handicaps. Leckelt, however, waived this issue under sections 84.11(a)(3) and 84.13(a) by not raising it below. Further, section 84.13(a) arguably is inapplicable to post-employment serological testing. *Compare* 45 C.F.R. § 84.13 ("A recipient may not make use of any employ-

## II. The Louisiana Civil Rights for Handicapped Persons Act

■ Leckelt contends that the defendants violated the Louisiana Civil Rights for Handicapped Persons Act (the Louisiana Act), La.Rev.Stat. § 46:2251, *et seq.*, by discharging him on the basis of a physical examination. Section 46:2254(C)(5) of the Louisiana Act, which was enacted in 1980 and has not been construed by any court (aside from the district court here), provides in pertinent part that employers may not

> "discharge or take other discriminatory action against an otherwise qualified individual *on the basis of physical* or mental *examinations* or preemployment interviews that are not directly related to the requirements of the specific job or which are not required of all employees." *Id.* (emphasis added).

The district court found this section of the Louisiana Act to be inapplicable because Leckelt's discharge was based on his failure to submit his test results, not on the basis of the test itself or its results.[20] We concur with the district court's interpretation of the Louisiana Act. *See also, e.g., Matter of Hyde*, 901 F.2d 57, 59 (5th Cir. 1990) (deference is appropriate to the determination of unsettled questions of state law by the district court sitting in that state).

## III. Equal Protection under the Fourteenth Amendment

■ Leckelt also contends that the defendants violated his right to equal protection under the Fourteenth Amendment. As the Supreme Court stated in *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985):

> "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.... The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to the legitimate state interest." *Id.* 105 S.Ct. at 3254 (citations omitted).

A plurality of the Court in *Cleburne* went on to hold that handicapped persons— there, the mentally retarded—are not "a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation." *Id.* at 3255; *see id.* at 3256 ("Heightened scrutiny inevitably involves substantive judgments about legislative decisions, and we doubt that the predicate for such judicial oversight is present where the classification deals with mental retardation."). *But see id.*, 105 S.Ct. at 3260 (Stevens, J., joined by Burger, C.J., concurring) (rejecting clearly defined standards of equal protection review based on the differing classifications of affected persons); *id.* at 3263 (Marshall, J., joined by Brennan, J., and Blackmun, J., concurring and dissenting) (endorsing heightened scrutiny of classifications involving the mentally retarded).

According to Leckelt, the plurality in *Cleburne*, notwithstanding its explicit language to the contrary, in effect applied some form of "intermediate" scrutiny. *See id.* at 3263–64 (Marshall, J., dissenting); L. Tribe, *American Constitutional Law* § 16–31, at 1595 n. 20 (2d ed. 1988). Leckelt, therefore, contends that a classification involving handicapped persons must have a medically reasonable basis in order to be

---

ment test *or other selection criterion* that screens out or tends to screen out handicapped persons" unless it "is shown to be job-related for the position in question."), *with id.* § 84.14(a) ("[A] recipient may not conduct a *preemployment medical examination* or may not make preemployment inquiry of an applicant as to whether the applicant is a handicapped person or as to the nature or severity of a handicap" unless certain enumerated exceptions are applicable.).

Even if section 84.13(a) were applicable, TGMC's request that Leckelt submit the results of his HIV antibody test is job related for the reasons discussed above.

**20.** The court also noted that the request for Leckelt's test results was directly related to the requirements of his job. We perceive no error in this holding.

upheld under the equal protection clause. In support of this contention, Leckelt relies on this Court's opinion in *Brennan*, where we "assume[d] without deciding that our 'rational basis' scrutiny of governmental decisions based on mental or physical handicaps is somewhat closer than usual." 834 F.2d at 1258.

Compelled by "the clear expression of the Supreme Court in *Cleburne*," Leckelt, 714 F.Supp. at 1390 n. 8, the district court held that "TGMC's infection control policies are rationally related to a legitimate state interest of protecting patients and health care workers from the spread of infectious or communicable diseases." *Id.* at 1390. The court also upheld the defendants' actions under the heightened scrutiny of the Louisiana Constitution. *See* La.Const. Art. 1, § 3. The Court stated, "The state had a substantial and compelling interest in preventing the spread of HIV infection or AIDS to hospital patients and co-workers, in preventing the spread of highly contagious diseases to HIV victims with impaired immune systems, and insuring that health care workers can safely and adequately perform their jobs." *Leckelt*, 714 F.Supp. at 1391.

Even if some form of heightened scrutiny were applicable to classifications involving handicapped persons, we conclude that no equal protection violation was established. As discussed above, TGMC required its employees to report exposure to any infectious or communicable disease and to undergo testing and working restrictions where necessary. For example, a health care worker who was exposed to HBV, a blood-borne disease like HIV, was required to be tested serologically and, if infected, to take at least three weeks' leave of absence. The November 1985 CDC guidelines provided that a health care worker who was relevantly exposed to HIV also should be tested periodically for seropositivity to HIV antibodies and, if infected, should be counseled and evaluated as to whether any work restrictions were appro-

priate. In light of its infection control policies and these guidelines, TGMC requested that Leckelt submit the results of the HIV antibody test that he had voluntarily taken on his own initiative. Likewise, at about the same time, TGMC requested that an RN, who had recently been exposed to HIV through a needle stick, undergo HIV antibody testing and submit those results to TGMC.[21] Under the circumstances, there was a reasonable medical basis for suspecting that Leckelt had been exposed to HIV and for requiring that he submit the results of his HIV antibody test. We therefore conclude that TGMC had a substantial and compelling interest in enforcing such infection control policies.

### IV. *Right of Privacy under the Fourth and Fourteenth Amendments*

■ Finally, Leckelt contends that the defendants' request that he divulge the results of his HIV antibody test violated his right to privacy under the Fourth Amendment, as applied to the states through the Fourteenth Amendment. The Fourth Amendment prohibits *unreasonable* governmental searches and seizures. "Thus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) (citations omitted). Rejecting Leckelt's Fourth Amendment challenge, the district court held that "[g]iven these longstanding infection control practices and procedures, and plaintiff's long-term relationship with an individual who had died of AIDS, plaintiff did not have a reasonable expectation of privacy with regards to his test results." *Leckelt*, 714 F.Supp. at 1391. The court went on to conclude, alternatively, that "[d]efendants' interest in knowing plaintiff's health status far outweighed the limited intrusion of requiring him to produce the results of a test he had already taken voluntarily." *Id.* at 1392.

21. Leckelt contends that TGMC treated him differently than it treated the RN because he, unlike the RN, was not allowed to work until he submitted the results of his HIV antibody test.

For the reasons earlier noted in connection with the discussion of Leckelt's claim of pretext, we reject this contention.

Leckelt knew that TGMC's infection control policies required its employees to report exposure to any infectious diseases and to undergo serological testing where necessary. Although there was no written policy specifically targeted at HIV infection or AIDS, the existing policies were sufficient to encompass such diseases as HIV. Leckelt was treated in 1984 for lymphadenopathy, a condition that is symptomatic of recent HIV infection and that his treating physician advised him might be related to AIDS. Leckelt also had been the roommate for eight years of Potter, who was diagnosed with AIDS and later died of AIDS-related complications. In light of Potter's illness, Leckelt was concerned about his own health and on his own initiative underwent HIV antibody testing in New Orleans. Under the circumstances, Leckelt at least had a significantly diminished expectation of privacy in the results of his HIV antibody test. *See Skinner*, 109 S.Ct. at 1418 ("[T]he expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees.").[22]

On a number of occasions, the Supreme Court has recognized the strong governmental interest in a safe, efficient workplace. *See e.g., id.* at 1414–15; *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1392–93, 103 L.Ed.2d 685 (1989). Likewise, TGMC had a strong interest in protecting the health of its employees and patients by preventing the spread of infectious diseases, such as HIV. Under all the circumstances respecting Leckelt, including his apparent homosexuality, medical condition, and long-term relationship with a man who was hospitalized with and ultimately died from AIDS-related complications, Smith was justified in demanding the results of Leckelt's HIV antibody test. Leckelt's duties as a licensed practical nurse provided opportunities for HIV transmission, and if he were infected with HIV, he would need to be advised of the risks and be evaluated periodically as to whether he could safely and adequately perform his duties. Thus, we conclude that TGMC's strong interests in maintaining a safe workplace through infection control outweighed the limited intrusion on any privacy interest of Leckelt in the results of his HIV antibody test.[23]

In sum, for the reasons stated, we conclude that, under the adequately supported findings of the district court, TGMC's requirement that Leckelt submit the results of his HIV antibody test, its refusal to permit him to work pending the submission of his test results, and its discharge of him for his persistent failure to submit these results, did not violate the federal Rehabilitation Act of 1973, the Louisiana Civil Rights for Handicapped Persons Act, the equal protection clause of the Fourteenth Amendment, or Leckelt's right to privacy under the Fourth and Fourteenth Amendments. The judgment of the district court is accordingly

AFFIRMED.

---

**22.** Further, because TGMC simply required Leckelt to submit the results of his voluntary test and did not require him to undergo any additional testing, the extent of any intrusion on his privacy expectations were limited.

**23.** Leckelt relies heavily on *Glover v. Eastern Neb. Comm'y Office of Retardation*, 867 F.2d 461 (8th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989). In *Glover*, the court held that blood testing for infectious diseases, such as HIV, of employees (including certain health care workers) of a community program providing various services for mentally retarded individuals and who had direct contact with these individuals constituted an unreasonable search under the Fourth Amendment. The court emphasized, however, that "[b]y our decision we intend no broad-based rule with respect to testing public employees for infectious disease, including AIDS." The facts in *Glover* are materially different, because the testing at issue there was much broader than that here, where only such employees as Leckelt who were reasonably suspected of having been exposed to such infectious diseases as HIV were subject to testing (test result reporting, in Leckelt's situation). This is a case of particularized, reasonable suspicion as to a specific individual; *Glover* is not.