John DOE, Plaintiff,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 91–1642.

United States District Court,
District of Columbia.

July 1, 1992.

560

Douglas B. Mishkin, Pamela Sherman, Melrod, Redman & Gartlan, and Joseph M. Sellers, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiff.

Eugene A. Adams, Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case is one of the first of what the Court expects may become numerous cases alleging discrimination on the basis of HIV-positive status in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and 42 U.S.C. § 1983.[1] The case, brought by an individual against the District of Columbia and the District of Columbia Fire Department (the Fire Department),[2] was tried before the Court during a one-day bench trial on June 8, 1992. The District presented no opening statement, no evi-

---

**1.** The case originally included the common law claims of breach of contract and breach of the right to privacy. These claims were voluntarily dropped by the plaintiff on the day of trial.

**2.** Although the Fire Department was named as a defendant, the Fire Department is not an independent entity with the capacity to sue or be sued. At trial, Doe pursued his claims against the District as the sole defendant, and this decision will treat the District as the sole defendant.

dence, and no closing argument. For the reasons that follow, the Court shall grant judgment for the plaintiff.

## I. FINDINGS OF FACT

### A. The Parties

Plaintiff John Doe (Doe) is an adult resident of Maryland whose true name and address have been withheld due to the sensitive and personal nature of the matters at issue. Doe is infected with the Human Immunodeficiency Virus (HIV), for which he first tested positive in 1986.

Defendant District of Columbia (the District) is a municipality that is treated as a state for the purposes of the Rehabilitation Act of 1973, 29 U.S.C. § 706(14) and 42 U.S.C. § 1983.

### B. The Hiring Process

The District hires persons to serve as firefighters within the Fire Department. To obtain a position as a firefighter, a person must pass a written and physical examination and a background investigation and must satisfy certain other prerequisites. As stipulated by the parties, the duties of a firefighter are:

> Searches, operates motor-driven pumps and hydrants, drives emergency vehicles, operates ladder trucks and aerial ladders, provides emergency (non-surgical) medical treatment to victims, maintains equipment, handles hose lines, overhauls and moves debris, sets up and starts generators and floodlights, transports victims, opens or breaks windows etc. in order to provide ventilation, performs station duties and chores, rescues and extricates victims, extinguishes fires, transports supplies and equipment, inspects electrical and heating systems, and performs salvage operations.

Exh. 32.[3]

Physical examinations of applicants for firefighter positions and routine annual physical examinations of acting firefighters

are conducted by the Board of Police and Fire Surgeons (the Board), an instrumentality of the District. Captain Terry Francisco, the Fire Department's medical officer, testified that a person who passes the physical examination administered by the Board is fully capable physically of performing the duties of a firefighter without risk to himself or others.[4] The Board's physical examination does not include an HIV test, nor does the Board inquire into the HIV status of examinees.

According to Captain Francisco, applicants who receive written notice of selection from the District (known as a Letter of Appointment) have satisfied all of the requirements for employment as a firefighter. An applicant who is rejected for a position of firefighter for medical reasons is entitled to a written statement from the District and/or the Fire Department, notifying him of his rejection, giving the basis for the rejection, and providing notice of the right to appeal the rejection.

### C. Firefighting Gear and Equipment

Every firefighter whose responsibilities include fighting fires is issued the following gear:

1. A helmet. The helmet is a hard shell with a transparent face shield in the front offering protection against blood-borne pathogen transmission. When fighting a fire or rendering emergency assistance, such as extracting an injured person from a trapped position, this face shield is lowered, thus protecting the firefighter from debris and minimizing the risk of blood splattering between the firefighter and the person being assisted.

2. A hood. The hood is placed on the head and covers the head and neck. It provides additional covering and an additional barrier should the firefighter have any open cuts or areas on the head or neck.

3. The "bunker coat." This coat is made of fire-resistant fabric, is resistant to

---

**3.** Because the defendants introduced no evidence in this case, the Court shall refer to all exhibits as simply "Exh. ——" rather than as "Plaintiff's Exh. ——."

**4.** Although Captain Francisco did not testify in person at the trial, portions of his deposition were designated and admitted into evidence.

562

high temperature and is very thick. The coat is not absorbent and, therefore, blood which splatters on the coat will not seep through it. The coat is also washable. There are compartments inside the coat for the firefighter to carry latex gloves and a pocket mask, which afford the firefighter additional protection while administering emergency CPR, even if the firefighter is not carrying the complete emergency medical kit (described below).

4. The "bunker pants." The pants are made with the same material as the jacket. They have knee pads reinforced with leather to protect against scrapes and needlestick injuries in the event the firefighter must crawl. Like the bunker coat, the texture and thickness of the pants create an effective barrier against the flow of blood into or out of the pants.

5. Gloves. The structural firefighter gloves are made of thick, fire-resistant material. Their thickness offers considerable protection against cuts or punctures. Standard practice is to throw them out if blood soils them, because they cannot be effectively cleaned.

6. The "bunker boots." These boots are made of very thick rubber with steel-reinforced toes, providing additional protection from debris and against saturation with blood.

7. Self-contained breathing apparatus. Resembling a scuba tank, this apparatus enables a firefighter to breath safely when entering a smoke-filled building.

8. Emergency medical kit. The kit contains emergency equipment to be carried by a firefighter, such as gloves and a pocket mask for CPR (both of which should be carried in the bunker coat), dressing materials, a bag mask ventilation device for CPR, stethoscope, blood pressure cuff, and other emergency supplies. The pocket mask for CPR provides a barrier so that there is no mouth-to-mouth contact.

D. The HIV Disease

1. *In General*

At trial, Doe presented and the Court accepted Dr. David Parenti as an expert witness in infectious disease and HIV. Dr. Parenti is an Associate Professor of Medicine in the Division of Infectious Disease at the George Washington University Medical Center in Washington, D.C. He is board certified in the specialty of infectious disease. He has taught, lectured, and written extensively on infectious disease, specifically HIV-related matters. Since 1984, Dr. Parenti has been a member of the Infection Control Committee of the George Washington University Medical Center, where he participates in devising and implementing institutional guidelines to minimize the risk of infection within the institution. He participated as the infectious disease specialist on an ad hoc committee charged with drafting the Medical Center's policy regarding HIV-infected health care workers. Dr. Parenti also is actively involved in the treatment of patients with HIV-related conditions, and estimates that he has treated approximately 500–600 patients for HIV-related conditions. *See* Exh. 30.

According to the uncontradicted testimony of Dr. Parenti, HIV is a retrovirus that destroys T–4 lymphocytes, a type of white blood cell, and causes a suppression of the normal immune system. Infection by HIV produces a wide spectrum of consequences. Those diseases that result from the most severe immunosuppression frequently are referred to as Acquired Immune Deficiency Syndrome (AIDS).

In the medical community, it is common to distinguish between HIV-positive persons who are "asymptomatic for HIV disease" and HIV-positive persons who are "symptomatic for HIV disease." An asymptomatic person who is infected with HIV will sometimes manifest certain conditions that are evidence of the infection, such as a lymphadenopathy (a disease of the lymph nodes), a diminution of the T–4 cell count, or flu-like symptoms. A symptomatic person who is infected with HIV will manifest other conditions that are actual symptoms of the disease. These symptoms include fever, sweats, sudden weight loss, chronic diarrhea, dementia, persistent oral candidiasis, and opportunistic infec-

tions such as Kaposi's Sarcoma or pneumocystis carinii pneumonia.

Although it cannot be predicted with precision how long a particular HIV-positive person will remain asymptomatic, Dr. Parenti testified that approximately half of those for whom the date of infection can be identified will exhibit symptoms within 10 years. Dr. Parenti underscored the difficulty of predicting the progression of HIV and noted that there is great variability among infected persons. Ultimately, however, the HIV virus undergoes a multiplication and becomes what is commonly referred to as AIDS. There is no cure for this disease, which is fatal.

According to Dr. Parenti, asymptomatic HIV-positivity does not affect a person's physical capabilities. For example, it does not impair a person's strength, agility, or ability to breath. Dr. Parenti specifically testified that an asymptomatic HIV-infected person should be able to perform all of the functions of a firefighter as stipulated to by the District. Based on this uncontroverted testimony, the Court finds that the ability to perform the functions of a firefighter is unaffected by asymptomatic HIV-positivity.

### 2. *The Risk of Harm to Self*

According to Dr. Parenti, the common conception that HIV-infected persons are more likely than others to catch colds, flus, and other infections is inaccurate. Instead, most of the infections to which an asymptomatic HIV-positive person is susceptible are reactivations of prior infections (viral, fungal or parasitic), to which the person has been exposed or which the person actually had at one time. Re-activation is triggered by diminution in the function of the immune system. According to the uncontroverted testimony of Dr. Parenti, which the Court accepts, the risk of re-activating a prior infection is not enhanced by performing the duties of a firefighter. Nor does fatigue or smoke inhalation accelerate the progression of the disease toward the symptomatic stage.

### 3. *Modes and Risks of Transmission*

There are only three recognized modes of transmitting the HIV virus: intimate sexual contact, puncture by contaminated intravenous needles, and receiving contaminated blood products. HIV is not casually transmitted and is not a "hardy" virus. There are no reported cases of transmission of HIV through shared toothbrushes or other common household items, or through casual contact such as touching or kissing.

The difficulty of transmitting HIV is reflected by the low percentage of health care workers, ranging between 0.3 percent and 0.5 percent, who become infected as a result of being stuck with a needle contaminated with HIV-positive blood. According to Dr. Parenti, it takes a fair volume of blood-to-blood contact in order to transmit the disease. Dr. Parenti is unaware of any cases of transmission by or to any health care worker during the performance of firefighting duties or while rendering emergency medical care. According to Dr. Parenti, there is "no measurable risk" that the disease will be transmitted through the performance of the firefighting duties stipulated to by the defendant. Not even the performance of mouth-to-mouth resuscitation without the use of a barrier will pose any risk of transmission of HIV. In fact, according to Dr. Parenti, the risk of transmitting the disease through the performance of firefighting functions "is like getting struck by a meteor while walking down Constitution Avenue" in Washington, D.C.

Dr. Parenti's conclusions are buttressed by the testimony of Katherine West, who testified at trial as an expert in infection control. Ms. West is a nurse certified in the specialty of infection control by the Association for Practitioners in Infection Control. "Infection control" is the discipline of applying the body of medical knowledge of infectious disease to preventing its spread. In the late 1970s, Ms. West pioneered the application of the discipline of infection control to fire departments and emergency medical services. To complement her medical background as a nurse, she has obtained first-hand knowledge of

the operation of fire and emergency medical units by, among other things, participating in numerous "ride-alongs," where she joins units in the course of their work to observe personally the actual conditions they encounter. Through her writing, teaching, and lecturing about infection control, and in particular about HIV-related issues, Ms. West plays a prominent role in the network of professionals engaged in this discipline. She is an Assistant Professor of Emergency Medicine at George Washington University School of Medicine and Health Sciences in Washington, D.C. and has consulted frequently with the National Fire Academy, the International Association of Fire Chiefs, and individual fire departments and emergency medical units throughout the nation on matters pertaining to infection control. Indeed, the District of Columbia Fire Department has consulted Ms. West regarding its policies and practices of infection control. *See* Exh. 31.

Ms. West testified extensively about the firefighting equipment and protective gear that is required to be provided to firefighters and emergency medical personnel by the Occupational Health and Safety Administration [5] and the National Fire Protection Association.[6] Using this equipment and protective gear eliminates the risk of blood-to-blood contact in the performance of firefighting functions. Ms. West characterized the risk of blood-to-blood contact during the performance of firefighting duties as "remote" and of transmission of HIV as "extremely small." She also noted that although it is "extremely rare" for a firefighter to have mouth-to-mouth contact with a rescue victim, such contact presents "no measurable risk" of transmission of HIV. Ms. West acknowledged that firefighters occasionally fail to wear their full uniform, particularly in hot weather. Nevertheless, she testified that the risk of blood-to-blood contact and the transmission of HIV is no greater when not wearing the full uniform. According to Ms. West, there are no reported cases of transmission of HIV to or from a firefighter during the course of his duties.

In addition to opining that HIV-positive firefighters do not pose a risk to themselves or others, Ms. West testified that her research has revealed several fire departments throughout the United States that employ HIV-positive firefighters in active-duty status. None of those departments employs or requires any special precautions to be undertaken by these HIV-positive personnel. The personal protective equipment routinely issued to all firefighters and the routine universal precautions required of all firefighters are sufficient to protect against harm to the firefighter or others.

Based on the uncontroverted testimony of Dr. Parenti and Ms. West, the Court finds that an HIV-infected person poses no measurable risk of transmitting the disease through the performance of firefighting duties.

### E. The Fire Department's Offer of Employment to Doe

In a letter dated January 23, 1989 (the Letter of Appointment), the District offered Doe a position as a firefighter with the District of Columbia Fire Department. *See* Exh. 14. This Letter of Appointment was received after Doe successfully passed the written and physical examinations and all the other prerequisites of employment as a firefighter. Captain Francisco testified that by passing the physical examination, Doe satisfied the Fire Department that he was fully qualified physically to serve as a firefighter.

The Letter of Appointment notified Doe that his annual salary as a firefighter would be $23,555. The Letter instructed Doe to report to the Fire Department on February 13, 1989 to begin employment. The Letter further advised Doe:

> Your first year will be served in a probationary status, during the course of which a suitability investigation will continue. If there is any derogatory or ad-

---

5. *See* Occupational Exposure to Blood-borne Pathogens, 29 C.F.R. Part 1910.1030.

6. NFPA 1581 Standard on Fire Department Infection Control Program, 1991 Edition.

verse information disclosed, your appointment to the Department will be terminated. Exh. 14. Although Doe did not consider his HIV-positivity to be "derogatory or adverse information," and although the District had not tested him for HIV or inquired about his HIV status before offering him the firefighter position, Doe was concerned that the District might learn his HIV status later and might consider this to be "derogatory or adverse information," which, because it was not disclosed, would warrant the termination of his employment. Thus, Doe contacted an official within the Fire Department and disclosed his HIV-positive status.

In response to Doe's disclosure, Doe was instructed not to report as instructed by the Letter of Appointment. He was instead asked to undergo, and did undergo, two blood tests for HIV, both of which were positive. Doe also submitted to a second physical exam, performed by Dr. Stanley Anderson, a Board physician. Although Doe contacted the Fire Department weekly for several weeks, he was never informed that he should report to work, nor was he informed that the offer of employment had been withdrawn. According to Captain Francisco, there was no question about Doe's capability of performing the functions of a firefighter. Instead, the decision not to permit him to report was made because of Doe's HIV status. Captain Francisco testified that had Doe not voluntarily informed the Department of his HIV-positive status, the Department would never have known and Doe would be a firefighter today. Fire Department Chief Rayfield Alfred testified that he considered the public's perception of HIV in deciding not to permit Doe to work, commenting that he "would be crazy" not to take the public's fear of HIV and AIDS into account.[7]

Doe testified that the District's refusal to permit him to work due to his HIV status made him feel "rejected," like he was "garbage," and that the District's refusal to

notify him of the status of his application was demoralizing. Doe cited his frustration at being denied the opportunity to serve as a firefighter, a position he continues to seek as a means of serving the community. In the meantime, however, Doe has been employed in many temporary positions. He has earned $14,739 in these various positions since February 1989. *See* Exh. 33.

### F. Doe's Medical Condition

From the time of his diagnosis as HIV-positive in 1986 until September 1990, Doe was examined regularly by Dr. Winston R.J. Frederick. *See* Exh. 27. At trial, Doe offered and the Court accepted Dr. Frederick as an expert in infectious disease and HIV infection. Dr. Frederick is and was at all times material hereto an Assistant Professor of Medicine at Howard University College of Medicine in Washington, D.C. He is board certified in internal medicine and is a practicing physician in Howard's Division of Infectious Disease in the Department of Medicine. He has treated approximately 600 patients for HIV-related conditions.

At no time has Dr. Frederick observed any symptoms of HIV disease in any of his examinations of Doe. According to Dr. Frederick, Doe has been asymptomatic for HIV disease and generally in good health at all times he has examined Doe.

At Doe's request, on July 7, 1989, Dr. Frederick issued a memorandum stating:

> This is to verify that Mr. [Doe] has been a patient under my care since 11/25/86 when he was admitted to Howard University Hospital for generalized lymphadenopathy. At this time Mr. [Doe] tested positive for antibody to The Human Immunodeficiency virus. He has been seen on average every three months and so far he is free of any opportunistic infections diagnostic of AIDS. Mr. [Doe] has requested this letter in order to have his positive tests confirmed and that he is able to perform gainful work.

---

**7.** Fire Chief Alfred's testimony, like that of Captain Francisco, was admitted through designated portions of his deposition.

Mr. [Doe's] condition is one of asymptomatic seropositivity for the human immunodeficiency virus and without symptoms he is able to perform any job that he is trained for or desires. Please feel free to contact this office if there are additional questions.

Exh. 17.

No one from the District or the Fire Department ever contacted Dr. Frederick to inquire about the July 7, 1989 memorandum or Doe's condition generally. Dr. Frederick concluded, based upon his repeated examinations of Doe, that at all times from November 1986 through September 1990, Doe's HIV status would not have impaired his ability to perform the duties of a firefighter.

In or about December 1989, ten months after Doe was to have begun work as a firefighter, Dr. Richard E. John, then the Acting Chairman of the Board, issued a memorandum to Fire Chief Alfred regarding Doe's medical status. *See* Exh. 20. In this memorandum, Dr. John concluded that "[t]he applicant is rejected for employment with the Fire Department." Dr. John recited the following reasons for his conclusion:

(a) C4/C8 ratio of 0.25 indicates chronic destruction of the immune system.

(b) Oral candidiasis 1986 and cervical lymphadenopathy clinical symptoms indicating advanced disease. Also positive HIV P24 antigen indicating advanced disease and poor prognosis.

(c) Applicant has HIV disease, which is a chronic infection associated with continuous progressive deterioration of the immune function that ultimately results in the development of severe and life threatening diseases. A condition that will interfere with the applicants [sic] ability to perform as a firefighter.

Exh. 20.

According to the unrebutted testimony of Drs. Frederick and Parenti, Dr. John's reasoning was flawed in several respects. First, the C4/C8 ratio of 0.25[8] did not necessarily indicate anything about Doe's ability to perform as a firefighter. Dr. Parenti testified that this ratio is rarely used to evaluate patients because it is not a particularly sensitive measure of the immune system. Moreover, Dr. Parenti testified that a person's T-cell count does not reveal anything about that person's physical condition, nor does it affect the risk of transmission of HIV or the progression toward symptomatic illness.

Second, according to Drs. Frederick and Parenti, the episode of oral candidiasis that Doe suffered from in 1986 was not an opportunistic infection symptomatic of HIV disease. Rather, Doe's medical records from the relevant time period indicated that his candidiasis was probably a reaction to an antibiotic that Doe had taken. Doe has not had any subsequent bouts of candidiasis. Similarly, Drs. Frederick and Parenti testified that the cervical lymphadenopathy which Doe exhibited in 1986 is not a symptom of HIV disease, but is merely evidence of HIV infection. At the early stages of infection, swollen lymph nodes (lymphadenopathy) reflect the activation of the lymph system, which is a positive development. In the later stages of the disease, persons suffering from great immunosuppression lack sufficient numbers of lymphocytes to cause lymphadenopathy.

Finally, with respect to Dr. John's conclusion that Doe's HIV status would interfere with his ability to perform as a firefighter, Drs. Parenti and Frederick both testified unequivocally that while Doe is asymptomatic, he is fully capable of performing the functions of a firefighter. This factor apparently was not taken into account by the panel of physicians on the Board who agreed that Doe was not an appropriate candidate to serve as a firefighter. According to one of those physicians, Dr. Stanley Anderson, the panel did not discuss whether Doe was physically capable of performing the duties of a firefighter. They merely agreed that Doe should not be a firefighter because of his HIV status.[9]

Not only are the Board's conclusions in conflict with Dr. Frederick's assessment of

---

**8.** This ratio refers to the number of T–4 "helper" cells to the number of T–8 "suppressor" cells.

**9.** Portions of Dr. Anderson's deposition, like that of Captain Francisco and Fire Chief Alfred, were admitted into evidence at trial.

Doe's health, they are also in conflict with Dr. Parenti's assessment based on two examinations in October 1990 and April 1992. On both occasions, Dr. Parenti found Doe to be asymptomatic for HIV disease. Furthermore, Dr. Parenti found Doe to be "robust," generally in good health and fully capable physically of performing the duties of a firefighter. In Dr. Parenti's expert opinion, Doe's HIV-status is, and has been, irrelevant to his physical capability to perform the duties of a firefighter. In Dr. Parenti's expert opinion, there is no measurable risk that Doe would transmit HIV to another person in the course of performing the duties of a firefighter. In Dr. Parenti's expert opinion, the duties of a firefighter would not place Doe at greater risk than an HIV-negative person is at when undertaking those duties.

Based on the expert testimony of Drs. Frederick and Parenti, the Court finds the conclusions reached by Dr. John are not credible. Moreover, the Court finds that, through April 1992, Doe has been physically capable of performing the duties of a firefighter without risk to himself or others.

## II. CONCLUSIONS OF LAW

### A. The Rehabilitation Act

#### 1. *The Standard of Review*

■ Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794. It is undisputed that the District of Columbia is subject to the provisions of the Rehabilitation Act because of its receipt of federal financial assistance. It is also undisputed that plaintiff is an "individual with handicaps" for purposes of the Act.[10] The definition of "individual with handicaps" does, however, exclude from coverage

> an individual who has a currently contagious disease or infection and who, by reason of such disease or infection, would constitute a direct threat to the health or safety of other individuals or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job.

29 U.S.C. § 706(8)(C).[11] Thus, to establish a *prima facie* case, Doe must show that his HIV-positive status does not pose a direct threat to others or prevent him from performing the requirements of a firefight-

**10.** Although the defendants did not present a case at trial, they did note in their trial brief that whether HIV-positive status is a handicap within the meaning of the Act is "not clearly settled." Defendants cited no case in which HIV-positivity has not been held to be a handicap and, in fact, cited several cases in which courts, including this one, have held it to be a handicap. *See Local 1812, AFGE v. U.S. Dep't of State,* 662 F.Supp. 50 (D.D.C.1987) (Gesell, J.). Moreover, the Department of Health and Human Services has taken the position that HIV positivity is a handicap for purposes of the Rehabilitation Act. *See In re Westchester County Medical Center,* 2 Emp.Prac.Guide (CCH) ¶ 5340 at 6999–323 to 324 (Apr. 20, 1992) (decision of the ALJ terminating federal financial assistance to the medical center based on unlawful discrimination against HIV-positive pharmacist). Finally, the Reagan Administration took the position that HIV-infected persons are handicapped within the meaning of the Act. *See* Memorandum from Douglas W. Kmiec, Acting

Assistant Attorney General, Office of Legal Counsel, to Arthur B. Culvahouse, Counsel to the President, FEP Manual (BNA) No. 641, at 405:6–7 (Sept. 27, 1988) (reprinted as Justice Department Memorandum on the Application of Section 504 of the 1973 Rehabilitation Act to HIV–Infected Persons).

**11.** Prior to addition of this provision in 1988, the Supreme Court concluded in *School Board of Nassau County v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987) that persons with contagious diseases were excluded from protection under the Rehabilitation Act if they posed a "significant risk" to others. The 1988 Amendments codified this exclusion but used the term "direct threat" to characterize this standard. These terms have come to be regarded as interchangeable. *See In re Westchester County Medical Center,* 2 Emp.Prac. Guide (CCH) ¶ 5340 at 6999–323 to 324 (Apr. 20, 1992).

er. He must also show that, in spite of his handicap, he is "otherwise qualified" for the position and was deprived of that position "solely" on the basis of his HIV-positive status. *See Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1387 (10th Cir.1981); *Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1,* 714 F.Supp. 1377, 1385 (E.D.La.1989), *aff'd,* 909 F.2d 820 (5th Cir.1990). The Supreme Court has held that "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). For purposes of this inquiry, the court should consider:

> (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Arline,* 480 U.S. at 288, 107 S.Ct. at 1131 (quoting Brief for American Medical Association as *amicus curiae* at 19).

■ Under the applicable regulations, if the handicapped person is unable to perform all of the essential functions of the job, the court must consider whether any "reasonable accommodation" by the employer would enable the handicapped person to perform those functions. 45 CFR § 84.3(k). Accommodation is not reasonable if it imposes "undue financial and administrative burdens" on the employer or if it requires "a fundamental alteration in the nature of [the] program." *Southeastern Community College,* 442 U.S. at 410, 411, 99 S.Ct. at 2369, 2370.

Once Doe has established a *prima facie* case of discrimination, the burden shifts to the defendant to show that Doe is not otherwise qualified for the job of a firefighter or that the denial of a firefighter position to Doe was for a reason other than his handicap. *See School Bd. of Nassau*

*County, Fla. v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Pushkin,* 658 F.2d at 1387; *Leckelt,* 714 F.Supp. at 1385. If the defendant meets this burden of production, the ultimate burden of persuasion shifts back to the Doe to prove that the reasons given by the defendant for rejecting him were "based on misconceptions or unfounded factual conclusions," or "encompass unjustified consideration of the handicap itself." *Pushkin,* 658 F.2d at 1387.

#### 2. *Application of the Standard*
a. Is Doe an Individual with Handicaps?

■ As the Court has already noted, the District does not dispute that Doe is handicapped within the meaning of the Rehabilitation Act based on his HIV-positive status. Thus, the Court holds that Doe is an "individual with handicaps" because he has a physical impairment that substantially limits its major life activities such as procreation, sexual contact, and normal social relationships.[12] *See In re Westchester County Medical Center,* 2 Emp.Prac.Guide (CCH) ¶ 5340 at 6999–318 to 319 (Apr. 20, 1992).

#### b. Does Doe Present a Direct Threat to Others?

■ In determining whether Doe's employment as a firefighter will pose a "direct threat" to the health or safety of others, *see* 29 U.S.C. § 706(8)(D), the Court must consider the factors set forth by the Supreme Court in *Arline,* 480 U.S. at 287, 107 S.Ct. at 1130–31 (nature of the risk, duration of the risk, severity of the risk, and probability of transmission). With respect to the nature of the risk, the unrebutted expert testimony of Dr. Parenti and Ms. West established that there are only three methods of transmission: intimate sexual contact, puncture with contaminated intravenous needles, and blood-to-blood contact. Obviously, neither of the first two methods of transmission would occur while performing the duties of a firefighter. With respect to the third—blood-to-blood

---

12. *See* 29 U.S.C. § 706(8)(B)(i), defining an "individual with handicaps" as a person who "has a physical or mental impairment which substan-tially limits one or more of such person's life activities."

contact—both experts testified that the risk of transmission through this means is extremely remote. Dr. Parenti compared the risk to that of being struck by a meteor. Furthermore, although both experts keep abreast of the relevant literature, neither was aware of any reported case of transmission through the performance of firefighting or emergency medical functions. In fact, Ms. West testified that many fire departments around the country employ HIV-positive firefighters without any extra precautions beyond those undertaken by all firefighters.

Based on the foregoing, the Court concludes that there is no measurable risk of Doe transmitting HIV to other firefighters or to the public during the performance of official firefighting duties. In reaching this conclusion, the Court joins other courts that have refused to regard the theoretical or remote possibility of transmission of HIV as a basis for excluding HIV-infected persons from employment or educational opportunities. *See e.g., Chalk v. U.S. District Court Central District of California*, 840 F.2d 701, 710–11 (9th Cir.1988) ("theoretical risk" of transmission does not warrant barring teacher from classroom); *Martinez v. School Board of Hillsborough County*, 711 F.Supp. 1066, 1070–72 (M.D.Fla.1989) ("remote theoretical possibility" of transmission via tears, saliva and urine does not rise to the level of "significant" risk required to bar child with AIDS from school), *on remand from* 861 F.2d 1502 (11th Cir.1988); *Doe v. Dolton Elementary School District No. 148*, 694 F.Supp. 440, 445 (N.D.Ill.1988) (no significant risk of transmission in classroom setting); *Ray v. School District of DeSoto County*, 666 F.Supp. 1524, 1535 (M.D.Fla. 1987) (supposed theoretical risk of transmission by HIV-positive grade school students unsupported by evidence despite incidents of bleeding); *District 27 Community School Board v. Board of Education*, 130 Misc.2d 398, 502 N.Y.S.2d 325, 332 (N.Y.Sup.Ct.1986) ("minimal theoretical risk" of transmission by fighting or biting no basis to segregate school children); *Jasperson v. Jessica's Nail Clinic*, 216 Cal. App.3d 1099, 265 Cal.Rptr. 301, 305 (Cal.Ct.

App.1989) (remote risk of bleeding no justification for refusal to give pedicure to person with AIDS).

With respect to the second two factors set forth in *Arline*, the duration of the risk and the severity of the risk, it is undisputed that Doe will pose the same risk as long as he remains HIV-positive and that the result of transmitting HIV to someone else is, ultimately, death from AIDS-related complications. Because the Court has already found the risk of transmission to be extremely remote, the duration and severity of the risk warrant little weight by the Court.

The fourth and final factor for the Court to consider is the probability that the handicapping disease will be transmitted to other persons. *Arline*, 480 U.S. at 288, 107 S.Ct. at 1131. This factor implicates many of the concerns that were addressed in the discussion of the first factor, the nature of the risk. Both Dr. Parenti and Ms. West established to the satisfaction of the Court that HIV is transmitted by limited means and that the risk of transmission by a firefighter during the performance of official duties is so remote as to be unmeasurable. Accordingly, the risk of transmission is so small that it vitiates any concern that Doe's HIV status will present a "direct threat" to other firefighters or to members of the public.

c. Is Doe "Otherwise Qualified"?

■ To establish a *prima facie* case, Doe must also show that his HIV status will not impair his ability to perform the duties of a firefighter in the District of Columbia. 29 U.S.C. § 706(8)(D). The expert testimony of Dr. Parenti and Dr. Frederick demonstrates beyond any reasonable doubt that Doe was and is fully fit to serve as a firefighter. Both described Doe as being in good physical condition and good health generally. Both emphasized that he is asymptomatic and able to perform any job he desires. In addition, the Fire Department's own physical examination, which Doe passed without qualification, confirms that the District regarded Doe to be physically capable of performing all of the duties of a firefighter prior to learning

of his HIV status. Together, this evidence is more than sufficient to show that Doe was, from February 1989 through at least April 1992 (when he was last examined) fully capable of performing the duties of firefighter. Indeed, Dr. Parenti testified that HIV status is simply irrelevant in assessing a person's physical capability to perform the duties of a firefighter. The Court agrees and in this case holds that Doe's HIV status has not impaired his ability to perform the specific duties of a firefighter. His successful passage of all of the prerequisites to employment as a firefighter renders him "otherwise qualified" for that position in accordance with § 504 of the Rehabilitation Act. 29 U.S.C. § 794.

#### d. Was Doe Denied Employment Solely Because of His Handicap?

As the final element of his *prima facie* case, Doe must show that he was denied employment "solely" because of his HIV status. 29 U.S.C. § 794. The Fire Department's records unequivocally reflect that the offer of employment to Doe was withdrawn because of a medical determination that his HIV status rendered him unfit to serve as a firefighter. *See* Exh. 20 (December 1989 Memorandum from Dr. John to Fire Chief Alfred). This conclusion is confirmed by the testimony of Dr. Anderson, who admitted that the panel of physicians did not even consider whether Doe was capable of performing the functions of a firefighter, and by Captain Francisco, who testified that if Doe had not voluntarily divulged his HIV status to Fire Department officials, he would be a firefighter now.

Not only did the District fail to provide any legitimate, nondiscriminatory reason for withdrawing the offer of employment, it did not even bother to inform Doe of its decision. Based on the foregoing, the Court holds that the District denied Doe employment solely because of his handicap.

#### 3. *Defendant's Burden*

■ Because Doe has satisfied the requirements of a *prima facie* case of discrimination in violation of the Rehabilita-

tion Act, the burden shifts to the defendant to show either that: a) Doe was not an "otherwise qualified individual with handicaps" or b) that he was denied a firefighter position for a reason other than his HIV status. *See Pushkin,* 658 F.2d at 1387; *Leckelt,* 714 F.Supp. at 1385. The District has not even attempted to satisfy these burdens. By failing to introduce any evidence at trial, the Court can only assume that the District has conceded that plaintiff has set forth a *prima facie* case under the Act. The evidence submitted by Doe bolsters this conclusion.

First, the District failed to rebut Doe's showing that he qualified as an "individual with handicaps." Doe satisfied both the traditional standard and the special requirement for persons whose handicap is a contagious illness. By its offer of employment to Doe, the District conceded that he was "otherwise qualified" for the position of firefighter. The District's own records revealed that it relied solely upon Doe's HIV status to deny him employment. *See* Exh. 20 (December 1989 Memorandum from Dr. John to Fire Chief Alfred).

In addition, the District relied upon the alleged public perception of persons with HIV in determining to deny Doe employment. Chief Alfred testified that he "would be crazy not to" consider the public's perception of this disease in formulating a policy regarding the employment of HIV-positive persons. This consideration is not permitted by § 504 of the Rehabilitation Act as a legitimate ground on which to deny handicapped persons employment. In the context of race discrimination, the Supreme Court has warned:

> The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. "Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held."

*Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (quoting *Palmer v. Thompson,* 403 U.S. 217, 260–61, 91 S.Ct. 1940, 1962–63, 29 L.Ed.2d 438 (1971) (White, J., dissenting)).

Because the District has failed to rebut Doe's *prima facie* showing of discrimination on the basis of Doe's HIV-positive status, the Court holds that the District has violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

### B. 42 U.S.C. § 1983

Because this Court has determined that the District is liable under the Rehabilitation Act, it need not consider Doe's claim under 42 U.S.C. § 1983. The remedies for violations of both are the same, as will be discussed below.

## III. REMEDIES

As a remedy for the discrimination the District has engaged in against him, Doe seeks instatement as a firefighter retroactive to February 1989; back pay with interest and other employment benefits; compensatory damages; injunctive and declaratory relief; and an award of reasonable attorneys fees and costs.

### A. Back Pay

■ Although the Act does not specifically prescribe the remedies that it makes available, it does provide that:

> The remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000d *et seq.*] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act.

29 U.S.C. § 794a(a)(2). Thus, it is clear that, because back pay and other equitable relief are allowed under Title VI, so too are they permitted under the Rehabilitation Act. *See Doe v. Southeastern University,* 732 F.Supp. 7, 9 (D.D.C.1990) (noting that the Supreme Court has allowed back pay and similar types of relief in Rehabilitation Act cases and citing *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984)).

■ This Court has held that the District wrongfully denied Doe the opportunity to assume his firefighter position in violation of the Rehabilitation Act of 1973. Thus, Doe is entitled to back pay from February 13, 1989, the day he was originally instructed to report to work, through the present, at the rate of $23,555 per year, along with interest and any raises or promotions or benefits that he would have received had he begun employment as originally scheduled. The award of back pay shall be set off by the $14,739 in wages that Doe has earned in the interim. *See* Exh. 33.

### B. Compensatory Damages

■ Doe also seeks compensatory damages for the emotional distress caused him by the uncertainty regarding his employment status, the feelings of rejection and isolation caused by the denial of employment to him because of his HIV status, and the loss of valuable years during which he could have served in his chosen profession. Although the Act does not specifically provide for the award of compensatory damages, this Court concludes that based on the Supreme Court's recent decision in *Franklin v. Gwinnett County Public Schools,* —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), compensatory damages are available under the Act.[13]

---

13. The Court recognizes that two prior decisions of colleagues on the district court have held that compensatory damages are unavailable under the Rehabilitation Act. *See Doe v. Southeastern University,* 732 F.Supp. 7, 9–10 (D.D.C.1990) (Harris, J.); *DuVall v. Postmaster General, United States Postal Service,* 585 F.Supp. 1374, 1377 (D.D.C.1984) (Richey, J.), *aff'd without opinion,* 774 F.2d 510 (D.C.Cir.1985). Nevertheless, this circuit has not directly addressed the issue. Several circuits have, however, concluded that such damages are available under the Act in cases of intentional discrimination. *See Smith v. Barton,* 914 F.2d 1330, 1337–38 (9th Cir.1990); *Ciampa v. Massachusetts Rehabilitation Commission,* 718 F.2d 1, 5 (1st Cir.1983); *Miener v. State of Missouri,* 673 F.2d 969, 978 (8th Cir.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *see also Marvin H. v. Austin Indep. School Dist.,* 714 F.2d 1348 (5th Cir.1983) (noting no right to compensatory damages in § 504 case absent intentional discrimination).

In *Franklin*, the Supreme Court unanimously held that compensatory damages are available for intentional discrimination under Title IX of the Education Amendments Act of 1972, which provides that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). In *Franklin*, the Court recognized the right to damages under Title IX notwithstanding that Congress had failed to provide for such remedies expressly when it enacted Title IX. In so doing, the Court adhered to the general principle that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." —— U.S. at ——, 112 S.Ct. at 1035. The Court also considered that, with the passage of the Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C. § 2000d–7 (the 1986 Amendment), Congress implicitly ratified the Supreme Court's earlier decision in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), wherein the Court held that Title IX is enforceable through an implied right of action. *Id.* at —— and ——, 112 S.Ct. at 1036 (White, J.) and 1039 (Scalia, J., concurring). The 1986 Amendment abrogated states' immunity under the eleventh amendment and provided for the same remedies as are available against parties other than the states, including, specifically, remedies at law and in equity for cases arising under Title IX,

Title VI, § 504 of the Rehabilitation Act, and the Age Discrimination Act. Thus, because Congress did not restrict the right of action recognized in *Cannon* or alter the "traditional presumption in favor of any appropriate relief for violation of a federal right," the Court concluded that Congress had not "limited the remedies available to a complainant in a suit brought under Title IX." *Id.* at ——, 112 S.Ct. at 1036–37. *See also id.* at ——, 112 S.Ct. at 1039 (Scalia, J., concurring) (concluding that the 1986 Amendment was not only a validation of *Cannon*, but was also "an implicit acknowledgement that damages are available").

The reasoning of *Franklin* is equally applicable with respect to § 504 of the Rehabilitation Act. It is well-established that Congress intended that the same remedies be available under Title IX and Title VI. *Guardians Assoc. v. Civil Service Comm'n of the City of New York*, 463 U.S. 582, 594, 103 S.Ct. 3221, 3228, 77 L.Ed.2d 866 (1983); *Cannon v. University of Chicago*, 441 U.S. 677, 694–95, 99 S.Ct. 1946, 1956–57, 60 L.Ed.2d 560 (1979) (Title IX derived from Title VI). Thus, *Franklin* must establish that damages are available in Title VI cases as well as Title IX cases. Similarly, because Congress specifically provided that the same remedies be available under § 504 of the Rehabilitation Act as are available under Title VI, *see* 29 U.S.C. § 794a(a)(2), *Franklin* must authorize the award of damages for intentional discrimination under § 504.[14] *See Tanberg v. Weld County Sheriff*, 787 F.Supp. 970, 972 (D.Colo.1992) (*Franklin* "provides dispositive analysis" that compensatory dam-

---

The district courts are divided on this issue. *See Cortes v. Board of Governors*, 766 F.Supp. 623, 625 nn. 1 & 2 (N.D.Ill.1991) (surveying district court decisions).

All of these decisions were rendered prior to the Supreme Court's opinion in *Franklin*, which this Court considers dispositive of the issue here.

**14.** Both *Doe v. Southeastern University*, 732 F.Supp. 7 (D.D.C.1990) and *DuVall v. Postmaster General*, 585 F.Supp. 1374 (D.D.C.1984), *aff'd without opinion*, 774 F.2d 510 (D.C.Cir.1985), on which *Southeastern University* relied, based their conclusions that damages were unavail-

able under § 504 by analogizing the remedies under the Rehabilitation Act to the equitable remedies available under Title VII of the Civil Rights Act of 1964. *See Southeastern University*, 732 F.Supp. at 10; *DuVall*, 585 F.Supp. at 1377. The holding in *Franklin* that damages may be recovered in private actions to enforce Title IX, and by analogy, Title IV, leads to the reasonable conclusion that the remedies available under § 504 are not limited to equitable relief. Accordingly, after *Franklin*, it appears that the analogy to Title VII was misplaced. *See Cortes v. Board of Governors*, 766 F.Supp. 623, 625 (N.D.Ill.1991).

ages are available under Rehabilitation Act for intentional discrimination based on HIV status). This conclusion is further supported by the Supreme Court's decision in *Guardians Assoc.*, which, although leaving open the question of compensatory damages under Title VI, specifically noted that "[i]n cases where intentional discrimination has been shown ... it may be that the victim of the intentional discrimination should be entitled to a compensatory award." 463 U.S. at 597, 103 S.Ct. at 3230.[15]

██ In this case, the evidence clearly shows that the District intentionally discriminated against Doe because of his HIV-positive status. Doe's testimony has established the emotional pain he endured from his rejection and the sense of isolation he felt from being singled out on the basis of his HIV status. Moreover, Doe testified that his rejection has deprived him of the opportunity to serve the community through public service. In consideration of the emotional pain Doe has been made to endure due to the District's and its officials' ill-conceived fears and prejudices, the Court awards Doe compensatory damages in the amount of $25,000.00. *See Tanberg*, 787 F.Supp. at 973 (money damages warranted to compensate plaintiff for loss of professional opportunity, mental anguish, and pain and suffering).

### C. Injunctive and Declaratory Relief

██ It is well-established that injunctive and declaratory relief are available under the Rehabilitation Act. *Doe v. Southeastern University*, 732 F.Supp. at 9–10. Based on the foregoing Findings of Fact and Conclusions of Law, the Court holds that Doe is entitled to instatement in the firefighter position offered to him, retroactive to February 13, 1989, to an injunction forbidding the District from discriminating on the basis of HIV status, and to a declaration that the District's policy and practice of denying employment on the basis of HIV status violates the Act.

An order consistent with this Opinion will be issued.

### ORDER

In accordance with the Memorandum Opinion issued herewith and for the reasons stated therein, it is this 1st day of July, 1992,

DECLARED that the District of Columbia's withdrawal of its offer of employment to plaintiff as a firefighter in the District of Columbia Fire Department was an act of discrimination on the basis of plaintiff's HIV-positive status in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and it is

ORDERED that judgment is hereby entered for the plaintiff and against the District of Columbia; and it is

FURTHER ORDERED that:

1) The District of Columbia shall instate plaintiff in the position of firefighter, retroactive to February 13, 1989, on or before August 3, 1992.

2) The District of Columbia shall pay to the plaintiff all back pay due him since February 13, 1989, at an annual salary of $23,555 plus any raises or promotions that he would have received in the ordinary course of employment. The back pay shall include interest and shall be set off by the $14,739 that plaintiff has earned in mitigation of his damages. The parties shall consult each other and submit a proposed order to the Court, on or before July 15, 1992, setting forth in detail the specific amount and method of payment of this back pay award.

3) The District of Columbia shall pay to the plaintiff $25,000.00, on or before August 3, 1992, as compensatory damages for the emotional pain and suffering that plaintiff endured as a result of the District's intentional discrimination.

4) The District is hereby enjoined from further discrimination based on the HIV status of the plaintiff.

---

**15.** In *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), the Supreme Court specifically left open "the extent to which money damages are available under § 504" of the Rehabilitation Act.

5) The parties shall consult with each other, pursuant to Local Rule 215(a), in an attempt to reach an agreement on the appropriate amount of attorneys fees owed to plaintiff under the Rehabilitation Act.

6) There shall be a status conference on August 3, 1992, at 9:00 a.m., in Courtroom 9, for the purposes of discussing the attorneys fees issue and any other unresolved matters arising from this Order.